No. 89,003

STATE OF KANSAS, *Appellee*, v. JUSTIN D. ELNICKI, *Appellant*.

105 P.3d 1222

Opinion filed February 18, 2005.

*Patrick H. Dunn,* assistant appellate defender, argued the cause and was on the brief for appellant.

*Deborah L. Hughes,* assistant district attorney, argued the cause, and *Robert D. Hecht,* district attorney, and *Phill Kline,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

Nuss, J.: A jury convicted Justin Elnicki of one count each of rape and aggravated criminal sodomy. The Court of Appeals affirmed in *State v. Elnicki,* 32 Kan. App. 2d 266, 80 P.3d 1190 (2003). This court granted Elnicki's petition for review under K.S.A. 20-3018(b).

Elnicki's six issues on appeal, and our accompanying holdings, are as follows:

1. Did the trial court err in allowing the jury to hear a detective's opinions about Elnicki's lack of credibility? Yes.
2. Did the prosecutor commit misconduct with her comments in closing argument? Yes.
3. Did cumulative error substantially prejudice Elnicki and deny him a fair trial? Yes.
4. Are Elnicki's convictions for rape and aggravated criminal sodomy supported by sufficient evidence? Yes.
5. Did the trial court err in using Elnicki's criminal history when sentencing for the nonbase offense? Moot.
6. Did the trial court err in using Elnicki's juvenile convictions to calculate his criminal history score? Moot.

Accordingly, we reverse Elnicki's convictions and remand for a new trial.

## FACTS

J.A. reported to Topeka police that she had been raped and sodomized in and near a vehicle in north Topeka during the early

morning hours of November 8, 2001. She sustained bumps, bruises, and scratches all over her body. Detective Karim Hazim of the Topeka police department was assigned to investigate. Later that day Justin Elnicki was arrested for the episode and interviewed by Hazim that evening at the police station. The interview lasted approximately 3½ hours and was recorded on videotape.

Elnicki first told Hazim that he never met a girl that night. He said that he was drinking with friends and then went home. He explained that the scratch on his neck was from a fight with his friend.

When Hazim confronted him with identifying evidence from J.A., Elnicki next said that he was too drunk to remember what happened. He said that he could have had sex with a girl, but did not remember if he had.

When Hazim told Elnicki that there was likely to be physical evidence linking him to the crime, Elnicki then remembered going to the Kwik Shop to buy cigarettes for his girlfriend. He told Hazim he met a girl there and talked about getting some marijuana. Elnicki said that she got into his truck and they left to get marijuana. At some point, they started kissing, and the girl performed oral sex on him. Elnicki said he was unable to get an erection and he did not ejaculate. After the interview, Hazim collected saliva, fingernail scrapings, and hair from Elnicki.

Several months later Hazim received a letter from Elnicki's ex-wife which had been written by Elnicki on February 26, 2002. The letter provided yet another account:

"I stoped [sic] at Kwik Shop to get some ciggarettes [sic]. There was a girl on the phone and we started talking and I asked her if she new [sic] where to find some bud [marijuana] and she said ya. So I asked her if she wanted a ride to go get it. She said sure so we put her bike in the back of the truck and we went to some house and she came back out and said she couldn't get any so we drove off and I ended up parking in some parking lot and we did the rest of my meth. That's when I asked her if she wanted to get freaky. She said no so I said well I will give you $25.00 she said alright. Well we started fooling around and I started fingering her and I noticed she didn't have any pubic hair and I asked her why she shaved it and she said because her man liked it that way. Well anyway I got out to take a leak and when I got done peeing I told her to come here and she came to the drivers side of the truck and I asked her to give me head and she got

on her knees and started sucking my penis but it would not get hard and I told her to get in the truck because I was scared someone might drive bye [*sic*] and she started sucking my penis in the truck and it still would not get hard so I played with it a little and then she played with it to. [*sic*] Well we tryed [*sic*] to have sex and my penis would not get hard so we said fuck it and we sat up and started talking and she asked me if I still wanted to find some bud. I told her no I needed to get home and she asked me for the money for the blowjob and I told her no because I didn't get nothing out of it and she said quit fucking around and give her the money. I told her to get her bike and get the fuck out of my truck. Then she grabbed my neck and I pulled away and she scratced [*sic*] the shit out of me. It made me real mad and I punched her a couple times and she ran so I chased her and hit her some more and she came after me so I put her in a head lock and she bit me so I punched her again and I ran to my truck and went home."

Evidence at trial demonstrated that the rape examination of J.A. and subsequent analysis revealed one of Elnicki's pubic hairs on her leg and his semen in her vagina. The blood stains discovered in his Blazer were determined to belong to J.A. Among other things, the jury also was shown Elnicki's videotaped interrogation by Hazim from which references to Elnicki's criminal experience had been deleted.

Upon Elnicki's conviction for rape and aggravated criminal sodomy, the trial court sentenced him to a presumptive sentence of 618 months' incarceration for the rape and a concurrent sentence for the aggravated criminal sodomy.

## **ANALYSIS**

Issue 1: *Did the trial court err in allowing the jury to hear a detective's opinions about Elnicki's lack of credibility?*

Standard of review

Elnicki claims that the trial court erred in allowing the jury to watch his videotaped interrogation in which Detective Hazim stated his opinions on Elnicki's credibility. The State suggests that our standard of review is for abuse of discretion based on the following:

"Admission of evidence is entrusted to the sound discretion of the trial court. Discretion is abused only where no reasonable person would take the view adopted by the trial court. Absent a clear showing of abuse of discretion, eviden-

tiary findings of the trial court will not be set aside on appeal." *State v. Parker*, 277 Kan. 838, 844, 89 P.3d 622 (2004).

In *State v. Carter*, 278 Kan. 74, Syl. ¶ 1, 91 P.3d 1162 (2004), however, we held that "evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question." When faced with the specific question of whether one witness may testify about another's credibility, arguably the district judge has little, if any, discretion. See *State v. Plaskett*, 271 Kan. 995, 1009, 27 P.3d 890 (2001) ("trial court erred in allowing Detective Langer to express his opinion as to whether A.W. was telling the truth").

Similarly, in *Kuhn v. Sandoz Pharmaceuticals Corp.*, 270 Kan. 443, 456, 14 P.2d 1170 (2000), while we acknowledged that an abuse of discretion standard is used in most cases involving the admissibility of scientific evidence, we held de novo review was appropriate there because the district court failed to correctly apply the standard of *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). We characterized the issue as a question of law. We cited, among other things, *Koon v. United States*, 518 U.S. 81, 100, 135 L. Ed. 2d 392, 116 S. Ct. 2035 (1996), which stated:

"Little turns, however, on whether we label review of this particular question abuse of discretion or de novo, for an abuse-of-discretion standard does not mean a mistake of law is beyond appellate correction. . . . The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions."

Based upon this case law, and as more fully explained in issue one, we hold that the proper standard of review of Hazim's credibility comments on the videotape is de novo.

Discussion

Elnicki objected to the following statements by Hazim in the videotape played to the jury:

1. "I'm a real honest person. I'm not gonna sit here and bullshit with you. And I would hope you're not gonna bullshit with me; this is serious and *you just told me a flat out lie.*"

2. "You didn't get into a fight. I can tell. *When somebody lies, their eyes shift, did you realize that?*"

3. Elnicki stated, "You called me a liar." Hazim replied, *"I may have called you a liar."*

4. "I'm not gonna sit here and yell at you, I'm not gonna scream at you. *I might call you a liar,* that's no big deal, but I'm not gonna disrespect you."

5. "Well what's gonna happen, you know, when you find yourself sitting in a courtroom or talking to your attorney and they pull up all this evidence and want to know where the hell it came from, you're going to look pretty stupid sitting there saying you don't know where it came from."

6. "You tell me what you remember. *All this other bullshit is a waste of your time and my time.* You're not doing yourself any justice at all."

7. When Elnicki stated that he did not remember what happened, but that his girlfriend told him, Hazim said, "Justin! *Bullshit! You're sitting here bullshitting me.*"

8. When Elnicki talked about getting in a fight with friends, Hazim said, "Justin, listen, you know what you're doing? You're weaving. *You're weaving a web of fucking lies, man."* (Emphasis added.)

Elnicki moved to redact those statements from the videotape, which the trial court denied. The court stated:

"All right. Well, I think it's part and parcel of the statement, and I don't think it impedes the prerogative of the jury to make a finding one way or the other about who's lying. I think people call people liars all the time, and it happens every day. That's not binding on the Court, it is not binding on the jury, it is just an observation."

When asked to review the tape, the court stated: "I know what's on it, I know what's at issue. I don't need to look at it."

Elnicki notes that the videotape had already been redacted for other purposes, *e.g.*, his criminal history, and argues it could easily have been redacted to eliminate these statements. The State counters that Hazim's statements are recommended interrogation techniques and that they provide context for Elnicki's answers, particularly the three different accounts about the episode he gave during the interrogation. The Court of Appeals agreed that the comments were admissible because they gave context; as a result, the trial court did not abuse its discretion in refusing to redact. *State v. Elnicki,* 32 Kan. App. 2d 266, 272, 80 P.3d 1190 (2003). The Court of Appeals did note, however, that it would "probably be the better practice to give a cautionary instruction to the jury

that statements made by officers in the course of interrogation are not sworn testimony and that only the jury can make determinations of the veracity of witnesses." 32 Kan. App. 2d at 272-73.

The issue of whether to allow a jury to view a videotape containing law enforcement's comments on a defendant's credibility such as Detective Hazim's is one of first impression in Kansas.

We start our analysis with the well-known rule that a witness may not express an opinion on the credibility of another witness. *State v. Jackson,* 239 Kan. 463, 470, 721 P.2d 232 (1986). This is because the determination of the truthfulness of a witness is for the jury. *Plaskett,* 271 Kan. at 1009. Moreover, the overwhelming majority of our recent decisions do not invoke an abuse of discretion or other standard of review for this issue. This absence strongly indicates an absolute prohibition against admission of this type of evidence. See *Plaskett,* 271 Kan. at 1008-09 ("trial court erred in allowing Detective Langer to express his opinion as to whether A.W. was telling the truth"); *State v. Manning,* 270 Kan. 674, 698, 19 P.3d 84 (2001) ("[q]uestions which compel a defendant or witness to comment on the credibility of another witness are improper"); *State v. Mullins,* 267 Kan. 84, 97, 977 P.2d 931 (1999) (line of inquiry equivalent to asking one witness if another witness was telling the truth was improper, "and the trial court erred in allowing the question to be answered"); *State v. Lash,* 237 Kan. 384, 386, 699 P.2d 49 (1985) (question "clearly was improper" because it called for an expression of expert's opinion about the credibility of witnesses); *cf. State v. Steadman,* 253 Kan. 297, 304, 855 P.2d 919 (1993) ("[t]he admission of witnesses' testimony that in their opinion the defendant was guilty . . . deprived the defendant of his right to a fair trial"); *cf. State v. Jackson,* 239 Kan. 463, 470, 721 P.2d 232 (1986) ("we think it was error for the trial court to permit the witnesses to testify and tell the jury that in their opinions the defendant committed the acts of molestation with which he was charged"). Contra *State v. Arrington,* 251 Kan. 747, 753, 840 P.2d 477 (1992).

In light of our prior decisions, we conclude the trial court has no discretion on whether to allow a witness to express an opinion

on the credibility of another witness; such evidence must be disallowed as a matter of law.

While Kansas courts have not specifically addressed admissibility of a police officer's statements about a defendant's credibility in a videotaped interrogation, other jurisdictions have, with mixed views.

In *Dubria v. Smith*, 224 F.3d 995 (9th Cir. 2000), the Ninth Circuit Court of Appeals considered a habeas petition from an inmate who claimed that he was denied a fair trial because of the admission of an unredacted tape from his police interview. In that tape, officers repeatedly told the petitioner that no judge or jury would believe him if he stuck to his story. 224 F.3d at 1000. The court found that the tape was of an "unremarkable interview" and did not present evidence or theories of the case that were not presented at trial. The statements were questions that gave context to petitioner's answers, "not the types of statements that carry any special aura of reliability." 224 F.3d at 1001, 1002. Furthermore, the court stated, any error was cured by two cautionary instructions given by the court, *e.g.*, cautioning that the detective's statements "are not to be considered for the truth, they are only to be considered as how they may give meaning to the answers." 224 F.3d at 1002. The court concluded the statements did not violate Dubria's fundamental right to due process. 224 F.3d at 1002. However, the court did not decide whether the admission of the statements violated the rules of evidence.

In a split decision, a majority of the Washington Supreme Court found the admission of such videotapes to be error, but a separate majority found any error to be harmless. *State v. Demery*, 144 Wash. 2d 753, 30 P.3d 1278 (2001). Similar to the court in *Dubria*, a majority of the *Demery* court stated that when the trial court admits third-party statements to provide context to a defendant's responses, the trial court should give a limiting instruction to the jury, explaining that only the defendant's responses, and not the third party's statements, should be considered as evidence. The court observed, however, that no such instruction was required in that case because "the jury clearly understood from the officer's

testimony that the statements were offered solely to provide context to the defendant's relevant responses." 144 Wash. 2d at 762.

Missouri appellate courts appear to take an even more lenient view in allowing admission of this evidence. In *State v. Palmes,* 964 S.W.2d 241, 243-44 (Mo. App. 1998), the Missouri Court of Appeals found no error whatsoever in the trial court's admitting an audiotape containing an officer's opinions on credibility because it was part of the give-and-take of an interrogation trying to elicit a response from the defendant, not expert opinion at trial. (citing *State v. O'Brien,* 857 S.W.2d 212 [Mo. 1993]); *cf. State v. Kluck,* 968 S.W.2d 206, 208 (Mo. App. 1998) (no error in allowing detective to testify that he did not believe the defendant because each time he would tell defendant he did not believe him, defendant would tell him a different version of what occurred; detective was merely recounting the "give-and-take" of the interview).

Pennsylvania appellate courts appear to take the opposite view. In *Commonwealth v. Kitchen,* 730 A.2d 513, 521 (Pa. Super. 1999), the Superior Court of Pennsylvania agreed with the trial court that comments where the police, either directly or indirectly, accused Kitchen of lying "must be redacted from the videotapes" of his interrogation. The court stated:

"When the troopers stated to Appellee, 'You're lying,' or 'We know that you're lying' or phrases to that effect, their statements were akin to a prosecutor offering his or her opinion of the truth or falsity of the evidence presented by a criminal defendant, and such opinions are inadmissible at trial. [Citation omitted.] The troopers' statements could also be analogized to a prosecutor's personal opinion, either in argument or via witnesses from the stand, as to the guilt or innocence of a criminal defendant, which is inadmissible at trial. [Citations omitted.]" 730 A.2d at 521.

Accord *Commonwealth v. Bolish,* 381 Pa. 500, 525-26, 113 A.2d 464 (1955) (admission of tape recording, in which among other things the district attorney several times accused defendant of lying, deprived defendant of a fair trial).

In an analogous situation, where the officer testified he had told the defendant during the interrogation that he did not believe him, the Washington Court of Appeals in *State v. Jones,* 117 Wash. App. 89, 91-92, 68 P.3d 1153 (2003), addressed the State's argument

that the officer was simply explaining his "interrogation technique" to the jury. The court disagreed:

"We find no meaningful difference between allowing an officer to testify directly that he does not believe the defendant and allowing the officer to testify that he told the defendant during questioning that he did not believe him. In either case, the jury learns the police officer's opinion about the defendant's credibility. And clothing the opinion in the garb of an interviewing technique does not help. As five of the justices determined in [State v. Demery, 144 Wash. 2d 753, 30 P.3d 1278 (2001)], an officer's accusation that a defendant is lying constitutes inadmissible opinion evidence. [Demery, 144 Wash. 2d at 765 (concurrence), 767 (dissent)]. Here, the jury heard that [Officer] Wilken did not believe Jones' comment that the gun was not his and that he did not know it was under the seat. This was a comment on Jones' credibility." 117 Wash. App. at 92.

The *Jones* court held that allowing the officer's comment was error and that a limiting instruction would not have cured the harm. It reversed and remanded.

Finally, in *State v. Cordova*, 137 Idaho 635, 51 P.3d 449 (Ct. App. 2002), the Court of Appeals of Idaho first found that an officer's statement on videotape that he was an expert in deception detection was improperly admitted, stating:

"As opposed to the 'unremarkable interview' observed in *Dubria* [*v. Smith*, 224 F.3d 995 (9th Cir. 2000)], the second officer's comments regarding his training and experience gave him the same aura of superior knowledge that accompanies expert witnesses in other trials. Accordingly, the second officer's assertions that Cordova was not being truthful appeared to be the comments of an expert, rather than the comments of a lay person investigating a crime. *Although we agree with the court in Demery, that the tactics employed in Cordova's interrogation are acceptable interrogation tactics, we do not agree that certain comments, which may be permissible for purposes of interrogating a defendant, are also admissible in court for consideration by the jury.*" (Emphasis added.) *Cordova*, 137 Idaho at 641.

The *Cordova* court next found that this officer's comments did not give context to Cordova's answers, since they were not connected to a question, but instead made as to a statement to Cordova. The court did find, however, that other statements by the police indicating that they believed Cordova was lying gave context to Cordova's inculpatory statements and were therefore admissible. It also found trial court error in admitting the statements without a limiting instruction informing the jury that the police questioning

was relevant only for the limited purpose of providing context to the defendant's answers and should not be considered for the truth of the officer's statements made therein. *Cordova*, 137 Idaho at 641-42. Because of other evidence in the case, however, the court concluded that both errors were harmless. *Cordova*, 137 Idaho at 642.

A synthesis of the referenced case law leads us to conclude that it was error for Detective Hazim's comments disputing Elnicki's credibility to be presented to the jury. The jury heard a law enforcement figure repeatedly tell Elnicki that he was a liar; that Elnicki was "bullshitting" him and "weaving a web of lies." The jury also heard the same law enforcement figure suggesting he could tell Elnicki was lying because Elnicki's eyes shifted. A jury is clearly prohibited from hearing such statements from the witness stand in Kansas and likewise should be prohibited from hearing them in a videotape, even if the statements are recommended and effective police interrogation tactics. As far as context for Elnicki's answers are concerned, the State could have safely accomplished its goal simply by having Detective Hazim testify and point out the progression of Elnicki's various stories as the tape was played — minus Hazim's numerous negative comments on Elnicki's credibility. The absence of a limiting instruction merely compounded the already serious problem, misleading the jury into believing that Hazim's negative comments carried the weight of testimony.

The full impact of the error in allowing Hazim's statements on Elnicki's credibility to be played to the jury is analyzed — together with the question of the impact of the prosecutor's similar statements to the jury — in our discussion of issues two and three.

*Issues 2 and 3: Did the prosecutor commit misconduct with her comments in closing argument and did cumulative error substantially prejudice Elnicki and deny him a fair trial?*

Elnicki next contends that, just as it was error for the jury to hear Hazim's negative comments on Elnicki's credibility, it was prosecutorial misconduct for the prosecutor during closing argument to express her personal opinion on Elnicki's credibility, J.A.'s

credibility, and the truth of the State's case. Elnicki made no objection to these statements at trial.

We recently stated our standard for reviewing such circumstances in *State v. Tosh,* 278 Kan. 83, 85, 91 P.3d 1204 (2004):

"A two-step analysis is applied to allegations of prosecutorial misconduct. First, the court decides whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. Second, the court must decide whether the comments constitute plain error; that is, whether the statements are so gross and flagrant as to prejudice the jury against the defendant and deny him or her a fair trial, thereby requiring reversal. The facts of each case must be scrutinized in determining whether a prosecutor's remarks deny the defendant a fair trial. If the prosecutor's statements rise to the level of violating a defendant's right to a fair trial and deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs without regard to a contemporaneous objection. *State v. McHenry,* 276 Kan. 513, 522, 78 P.3d 403 (2003)."

Elnicki complains that the following italicized prosecutorial statements in closing argument were improper comment on his credibility:

"*The defendant's story of what happened lacks plausibility and credibility.* And I think you can see that most clearly and in the fascinating way that it progresses from a total lack of any memory and ever being anywhere and totally being with his friends to *the final yarn* that explains away each and every cut, bruise, and piece of physical evidence.

. . . .

". . . And did you notice how certain he is during that period of time when Hazim continues to challenge *this fairy tale*? He is certain he was nowhere but with his friends and his girlfriend. He proclaims clearly that he did not have sex with anyone that night. He is with Josh Martin until 4:30 when he goes home.

"But that is not accurate. That is a story. *It's a fabrication* of this defendant that he devised to protect himself. You know it, and Detective Hazim knew it that night.

"The second phase of his story is I know nothing. It's a change. His *tall tale* isn't working, so you got to have an alternate version. . . .

. . . .

"The third part of *this yarn,* it's really a miraculous memory recovery, it's a miracle, the fog is lifting. . . . He told Detective Hazim that in this recall over and over again that this was consensual oral sex. *He is clear in this fabrication,* though, that he never got an erection and he never ejaculated.

. . . .

"Do you suppose if his wife hadn't turned this [the 2002 letter] over to Detective Hazim you would have ever gotten this version of the truth? And what is he

trying to do even with this version? What he is trying to do is *spin it*. You have all heard *spin*. The *spin* is this. Focus here, which explains everything away, and maybe you will all forget that previous four hours and all the other three versions. Maybe you will forget that if he *spins* this correctly. . . .

. . . .

"The injuries had to have come after any — any sexual content — contact in this case. They had to come afterward, *in defendant's yarn*, because otherwise it looks forced. . . .

. . . .

"Ladies and gentlemen, as you listen to the defense, you will hear that it is [J.A.] who is fabricating. You will hear that she made everything up. But consider if you will *the yarn spun here, the four-part yarn*. . . .

. . . .

"Don't let the defense poo-poo the defendant's four-part statement to you saying, well, it's the State's burden of proof, *so it doesn't really matter if he lied*. . . .

. . . .

"Ladies and gentlemen, beyond a reasonable doubt the State has proved its case. [J.A.] may have been immature, she may have been stupid, but she was raped and she was forced to suck his dick, and he did it and he didn't care. And, ladies and gentlemen, *the truth shows you* beyond a reasonable doubt *the defendant is guilty of the crimes with which he is charged*. Thank you." (Emphasis added.)

The State responds that these statements were fair comment on Elnicki's four versions of the events — (1) that Elnicki had been drinking at a bar and then went home and that the scratches were from a fight with a friend; (2) that Elnicki was too drunk to remember what happened and that he could have had sex with a girl, but did not remember; (3) that Elnicki went to the Kwik Shop to buy cigarettes for his girlfriend and met a girl there; that at some point they got in his Blazer, started making out, and that she voluntarily performed oral sex; and (4) the version in Elnicki's 2002 letter. Additionally, the State contends that the prosecutor never expressed her personal knowledge or opinion on Elnicki's credibility, but was commenting on the unbelievability of his versions based on his four conflicting stories and the physical evidence. The Court of Appeals agreed.

Elnicki also complains that the State vouched for J.A.'s credibility when the prosecutor stated during closing arguments: "He is threatening to her. He is threatening the whole time. The force, she is very consistent about the force he was using, does not change

on the force at all. And the demands he was making, the things he was saying to her, *you know she was telling you the truth.*" (Emphasis added.)

The State responds that this comment followed a recitation of the consistencies in J.A.'s testimony and the physical evidence, and was made in rebuttal to defense counsel's closing argument that J.A.'s testimony was unbelievable. The Court of Appeals agreed.

As mentioned, our first analytical step is to determine whether these remarks were outside the wide latitude allowed in discussing the evidence. See *State v. Tosh*, 278 Kan. at 85. In *State v. Pabst*, 268 Kan. 501, 996 P.2d 321 (2000), this court considered both categories of the misconduct alleged in the instant case: (1) the prosecutor's closing argument that accused the defendant of lying — 11 times — and (2) the prosecutor's comment on the credibility of his own witnesses. This court found that both types of statements were improper, stating:

"Whether couched in terms of the State or the prosecutor, the assertion that Pabst lied was improper. See *State v. Lockhart*, 24 Kan. App. 2d 488, 492, 947 P.2d 461 (1997). It was also improper for the prosecutor to claim, 'We didn't lie to you,' in an attempt to bolster the credibility of the State's witnesses. See *State v. Mosley*, 25 Kan. App. 2d 519, 525, 965 P.2d 848, *rev. denied* 266 Kan. 1113 (1998) (involving prosecutor's comment on the credibility of his own witnesses)." 268 Kan. at 506.

The *Pabst* court looked at the Kansas Rules of Professional Conduct and the American Bar Association Standards of Criminal Justice (3d ed. 1993) and determined: "Our rules of conduct clearly and unequivocally say that it is improper for a lawyer to comment on a witness' credibility." 268 Kan. at 506. This court further stated:

"Both the prosecutor and the trial judge have a responsibility to ensure that closing argument is kept within the proper bounds. ABA Standard 3-5.8(e).

"Pabst's credibility was crucial to the case. The prosecutor placed before the jury unsworn testimony which it should not have considered: his personal opinion on Pabst's credibility and the credibility of the State's evidence. Stating facts not in evidence is clearly improper. See *State v. Bradford*, 219 Kan. 336, Syl. ¶ 4, 548 P.2d 812 (1976). *Accusing Pabst of lying goes far beyond the traditional wide latitude afforded to prosecutors in closing argument.* See *Lockhart*, 24 Kan. App. 2d at 492. Inherent in this wide latitude is the freedom to craft an argument that includes reasonable inferences based on the evidence. When a case develops that

turns on which of two conflicting stories is true, it may be reasonable to argue, based on evidence, that certain testimony is not believable. However, the ultimate conclusion as to any witness' veracity rests solely with the jury." (Emphasis added.) 268 Kan. at 507.

The *Pabst* court specifically disapproved of contrary language in *State v. McClain*, 216 Kan. 602, 608, 533 P.2d 1277 (1975), where that court stated: " 'Counsel may comment on the credibility of a witness where his remarks are based on the facts in evidence and a considerable latitude is allowed in that discussion.' " 268 Kan. at 507.

Notwithstanding our holding in *Pabst*, in *State v. Finley*, 273 Kan. 237, 42 P.3d 723 (2002), this court found that the prosecutor's statement, "He's said various things at various times, and the reason why people do that is because they can't keep all the lies straight" was a proper comment based on evidence, not on the prosecutor's personal knowledge of the defendant's veracity. 273 Kan. at 246. Similarly, we found it was not error for the prosecutor to say, "Tom and Denise are the only ones that really have a motive to fabricate any lies in this case" and "Tom and Denise had plenty of time to get their stories straight, to conjure up what they were going to tell you all." We did find error, however, to the extent the prosecutor expressed her belief as to credibility when she stated, "And I'm sorry, but I just can't buy this story that Tom and Denise come up with that Tom was somewhat of a hero risking his life to go in and save these people in the house." 273 Kan. at 247.

Similarly, in *State v. Moore*, 274 Kan. 639, 646, 55 P.3d 903 (2002), the prosecutor in closing argument made the statements, "[N]othing that you've been told here in the last two days should indicate to you that she's a liar" and "Well, she already paints him as a liar just by that alone." This court held that those two statements were not outside the considerable latitude the prosecutor is allowed in discussing the evidence. 274 Kan. at 646. "[T]he prosecutor was explaining to the jury why, in light of the evidence presented, Moore's story was not feasible." 274 Kan. at 646. We also held the "comments were not so gross and flagrant as to prejudice the jury against the defendant and to deny him a fair trial." 274 Kan. at 646-47; see also *State v. Douglas*, 274 Kan. 96, 49 P.3d

446 (2002), *cert. denied* 537 U.S. 1198 (2003) (prosecutor's characterization of defendant's version of facts as "unbelievable" did not rise to the level of conduct in *Pabst*, but calling defendant's story "ridiculous and absurd and ludicrous" appeared to be improper comment).

However, in *State v. Graham*, 277 Kan. 121, 129, 130, 83 P.3d 143 (2004), we criticized the prosecutor's statements during closing argument, "I submit to you [the defendant] didn't tell you anything that was true," and "I caught [defendant] by surprise. She had to come up with that [answer]," and finally, "It's hard to make things up on the fly I would submit to you." We held the prosecutor's comments were outside the wide latitude in discussing the evidence but not so gross and flagrant as to prejudice the jury and deny defendant a fair trial. 277 Kan. at 131-32.

In the instant case, in describing what the prosecutor argued were four versions of Elnicki's statements regarding the episode, she did not use the specific word "lie," but used terms such as "yarn," "fairy tale," "fabrication," "tall tale," and "spin." Nevertheless, in *State v. Finley*, 273 Kan. at 247, we held: "*Pabst* informs us the use of the word 'lie' or its derivative should be avoided by prosecutors . . . ." According to Webster's Third New International Dictionary 2647 (1967), one definition of "yarn" is "an entertaining narrative of real or *fictitious* adventures." (Emphasis added.) Similarly, "fairy tale" is defined as "an implausible, incredible, or *lying* story; a story designed to delude or mislead." Webster's 816. (Emphasis added.) Likewise, "fabrication" is defined as "the *invention* or utterance of something *calculated to deceive*." Webster's 811. (Emphasis added.) "Spin" can be defined as "to evolve, express, or *fabricate* by processes of mind or imagination." Webster's 2195. (Emphasis added.) In short, the prosecutor argued, through a thin disguise, that each of Elnicki's four versions of the episode was a "lie."

We acknowledge that, unlike the defendants in cases such as *Pabst*, Elnicki did not merely give a version contrary to J.A.'s, but rather gave inconsistent statements himself. The Court of Appeals addressed a defendant's two inconsistent statements in the context

of allegations of prosecutorial misconduct in *State v. Smith*, 28 Kan. App. 2d 56, 11 P.3d 520 (2000). The *Smith* court stated:

"Here, it was permissible for the State to point out the inconsistencies in Smith's statements. Both versions of Smith's story cannot be true and at least one of the versions must be fabricated. By telling inconsistent stories, Smith opened the door for the State to comment on the reasonable inference that his testimony was not believable. Specifically, it was permissible for the State to argue that Smith's testimony that the drugs belonged to Harvey was not credible based on his statement to Officer Davis.

"Nevertheless, it was the duty of the jury, not the State, to ultimately decide which, if any, of Smith's statements was believable. As such, the prosecutor should have confined his arguments to what the evidence showed: Smith's statements were inconsistent. Instead of simply pointing out the inconsistencies in Smith's statements and noting that at least one of the stories must be fabricated, *the prosecutor used prejudicial language when he made statements such as, 'There is no doubt whatsoever that he's a liar.'*

"Although the State is permitted wide latitude in closing argument and may point out inconsistencies in a defendant's statements, we find that the State committed prosecutorial misconduct by repeatedly referring to Smith as a liar. The State's unprofessional comments on the evidence lie far beyond the traditional wide latitude afforded to prosecutors in closing argument. See *Lockhart*, 24 Kan. App. 2d at 492. As a result, even though Smith opened the door for fair comment on his veracity, *we find that the prosecutor committed prosecutorial misconduct by repeatedly referring to Smith as a liar during closing arguments.*" (Emphasis added.) 28 Kan. App. 2d at 67-68.

Similarly, in the instant case, although Elnicki did not testify at trial, his credibility was placed in issue by his statements to Hazim and by his letter. At the outset, we acknowledge our language in *Finley, Moore,* and *Douglas* suggests that several of the prosecutor's statements arguably could be fair comment on the evidence regarding Elnicki's first three versions of the episode, since each was succeeded by yet another inconsistent Elnicki version. However, clearly the same cannot be said about his final, written version. Her comments about his final version — a "fabrication," "yarn," "final yarn," and "the yarn spun here, the four-part yarn" — are not based upon a later inconsistent statement, and were unquestionably outside the wide latitude allowed in discussing the evidence. Moreover, we agree with the holding of the Court of Appeals in *State v Smith, i.e.,* the repeated reference throughout

the closing argument to the defendant as a "liar" — or the term's alleged euphemisms, as here — is itself improper.

Regarding the prosecutor's comment on the credibility of the victim, J.A., we acknowledge that a prosecutor should not comment on the credibility of his or her own witnesses. *State v. Pabst,* 268 Kan. at 506 (citing *State v. Mosley,* 25 Kan. App. 2d at 525). It may be argued that the statement "you know she was telling you the truth" was only a rebuttal comment by the prosecutor after defendant's closing argument challenging J.A.'s credibility. Defense counsel had made repeated references to "her lies" and "she's lying." As we stated in *State v. McKinney,* 272 Kan. 331, 347, 33 P.3d 234 (2002), "[w]e have held that there is no prejudicial error when questionable remarks made by a prosecuting attorney are provoked and made in response to previous arguments or statements of defense counsel." While the prosecutor's comments here about J.A. are not necessarily prejudicial, they are nevertheless error. Furthermore, defense counsel's comments on J.A.'s credibility in closing may themselves have been provoked, given they followed the jury hearing Hazim's derogatory comments about Elnicki's credibility on the videotape, and immediately followed the jury hearing the prosecutor's initial closing argument about Elnicki's yarns, tall tales, and fairy tales.

For the same reason, we hold it was error for the prosecutor to conclude her closing argument with "*the truth shows you* beyond a reasonable doubt the defendant is guilty of the crimes with which he is charged." This is improper comment on "the credibility of the State's evidence." *Pabst,* 268 Kan. at 507.

The first requirement of the test for prosecutorial misconduct having been met, we turn to the second, *i.e.,* whether the comments were so gross and flagrant as to prejudice the jury against Elnicki and deny him a fair trial, thereby requiring reversal. See *Tosh,* 278 Kan. at 85.

In *Tosh* we explained that three factors should be considered in determining whether to grant a new trial because of prosecutorial misconduct: (1) whether the misconduct is so gross and flagrant as to deny the accused a fair trial; (2) whether the remarks show ill will on the prosecutor's part; and (3) whether the evidence against

the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors.

We acknowledged in *Tosh* that the first of these three factors merely repeated

"in part the statement of the ultimate second step of the analysis: 'Whether the misconduct was so gross and flagrant that it denied the defendant a fair trial.' Thus, the second step of the analysis is essentially directed to whether the misconduct is so prejudicial that it denies the defendant a fair trial. This analysis requires a particularized harmlessness inquiry utilizing the three factors . . . ." *Tosh*, 278 Kan. at 93.

In *Tosh*, we further acknowledged that none of these three factors is individually controlling, but that there are degrees of seriousness in such misbehavior. "[O]ur appellate courts must have the freedom to consider those degrees and their likely effects as they decide whether the misbehavior before them in a given case merits reversal and remand for new trial." *Tosh*, 278 Kan. at 93-94. We counseled caution in a court's evaluation of the third harmlessness factor: "We must avoid using this factor and the weight of inculpatory evidence as a default, a shortcut past careful comparison of the often competing influences of the first two factors." *Tosh*, 278 Kan. at 97. Accordingly, we held:

"Before the third factor can ever override the first two factors, an appellate court must be able to say that both the K.S.A. 60-261 ["inconsistent with substantial justice"] and the *Chapman* [*v. California*, 386 U.S. 18, 22, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (error harmless beyond a reasonable doubt in that it had little, if any, likelihood of having changed the result of the trial)] harmlessness tests have been met. If this can be said, then certainly it will also be true 'that the misconduct would likely have little weight in the minds of jurors.' " *Tosh*, 278 Kan. at 97.

With this analytical framework in mind, we examine the first factor in our particularized harmlessness inquiry in the instant case, *i.e.*, did the misconduct prejudice the jury against Elnicki? We hold that it did. The credibility of J.A. and Elnicki were paramount to determining one of the main issues in the case, *i.e.*, consent to the sexual acts. The prosecutor's numerous and colorful closing comments regarding Elnicki's lack of credibility had to have harmed him. Moreover, these negative comments were harmfully layered

on top of Detective Hazim's prior statements on the videotape calling Elnicki a liar.

Regarding the second factor, the question of the prosecutor's ill will is a more difficult one. On the one hand, she appears to have carefully avoided using any variation of the word "lie." On the other hand, her comments were deliberate and repeated, featuring various synonyms expressing negative opinions on Elnicki's credibility, *e.g.*, his account is a "four-part yarn." We clearly cautioned in February 2000 in *State v. Pabst,* 268 Kan. 501, against prosecutors commenting on a witness' credibility. Our notification included not only the professional warning that it violated Kansas and American Bar Association ethical standards, but also a practical one, *i.e.*, reversal of Pabst's first-degree murder conviction based almost entirely upon improper prosecutorial remarks. Additionally, on March 15, 2002, we stated that *Pabst* informed "us the use of the word 'lie' or its derivative should be avoided by prosecutors." *State v. Finley,* 273 Kan. at 247. In light of the prosecutor's failure to heed our warnings during the Elnicki trial in late March 2002, we hold that her statements demonstrated some ill will.

Regarding the third factor, the evidence was not of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. Although the evidence was uniform that Elnicki and J.A. were together and that Elnicki had sex, or attempted to have sex, with her, the jury was asked to decide between two explanations of the physical evidence — J.A.'s injuries, J.A.'s blood on the seats of the Blazer, scratch and bite marks on Elnicki, his semen in J.A.'s vagina, and Elnicki's pubic hair found on J.A.'s thigh. In Elnicki's version of events, the sexual activity was consensual, but then resulted in Elnicki beating J.A. In J.A.'s version of events, Elnicki raped, sodomized, and beat her throughout the sexual assault. As stated previously, consent was a central issue and was clearly in dispute.

*Pabst* illustrates the dangers of a prosecutor interjecting himself or herself into the jury's resolution of competing stories on a central issue:

"In assessing prejudice, it is important to first recognize that the jury here had to decide whether the shooting was accidental or planned. The prosecutor should

have confined his arguments to what the evidence showed. *Instead, the prosecutor's improper argument commented on what the jury inevitably had to decide: whether Pabst's assertion of an accidental shooting was a fabrication. The prosecutor's statements are problematic because he improperly and prejudicially attempted to introduce evidence* [his opinion on defendant's credibility] *on the ultimate issue.*" (Emphasis added.) 268 Kan. at 509.

Based upon the prosecutor's repeated negative comments during closing argument about Elnicki's "yarns," "fairy tales," and "tall tales," and her positive comments about the credibility of J.A. and of the State's "truthful" evidence, we hold that both the state test (K.S.A. 60-261) and federal test (*Chapman v. California*) for reversible error have been met on this issue. See *Tosh,* 278 Kan. at 97. Although this is a close call, we reverse Elnicki's conviction and remand for a new trial.

The decision to reverse and remand is greatly strengthened, however, by our having held the trial court also erred in allowing the jury to hear Detective Hazim's negative statements on the videotape. As mentioned, those statements also impermissibly allowed comment on the defendant's credibility in a case where a key factor was the credibility of the defendant and the alleged victim. Similar to the prosecutor in *Pabst* who improperly commented on the credibility of witnesses regarding the ultimate issue in the case, a police officer improperly commented on the credibility of the defendant regarding the ultimate issue during an interrogation in *State v. Jones,* 117 Wash. App. 89, 68 P.3d 1153 (2003). The court stated:

"We find no meaningful difference between allowing an officer to testify directly that he does not believe the defendant and allowing the officer to testify that he told the defendant during questioning that he did not believe him.

. . . .

"Here, the jury heard that [Officer] Wilken did not believe Jones' comment that the gun was not his and that he did not know it was under the seat. This was a comment on Jones' credibility. But the State contends that the error, if any, was harmless. Again we disagree. The only issue in the case was whether Jones constructively possessed the gun. And this came down to whether Jones knew the gun was under his seat. Jones said he did not; Wilken said he did not believe Jones. We conclude that an instruction would not have cured the harm. Accordingly, the misconduct requires that we reverse and remand for a new trial. [Citation omitted.]" 117 Wash. App. at 92.

*Cf. State v. Plaskett,* 271 Kan. 995, 1007-09, 27 P.3d 890 (2001) (allowing a law enforcement witness to testify about another witness' credibility was itself reversible error); *State v. Jackson,* 239 Kan. 463, 467-70, 721 P.2d 232 (1986) (allowing SRS investigators to testify that in their opinion the victim was telling the truth was itself reversible error); contra *State v. Manning,* 270 Kan. 674, 697-702, 19 P.3d 84 (2001) (though error, improper questioning did not prejudice the jury against accused and deny him a fair trial); *State v. Mullins,* 267 Kan. 84, 97, 977 P.2d 931 (1999) (though error, was harmless under K.S.A. 60-261 in light of other evidence).

Under our facts, however, we need not determine whether the improper allowance of Detective Hazim's statements itself constitutes reversible error or simply harmless error under K.S.A. 60-261. See *Plaskett,* 271 Kan. at 1031 (allowing a law enforcement witness to testify about another witness' credibility was reversible error; if not, the cumulative effect of the trial errors substantially prejudiced defendant and denied him a fair trial, requiring reversal of conviction). In short, we readily agree with Elnicki's third argument, *i.e.,* that cumulative trial errors prevented him from receiving a fair trial, justifying reversal of his convictions and remand for a new trial. See *State v. Lumbrera,* 252 Kan. 54, Syl. ¶ 1, 845 P.2d 609 (1992).

Issue 4: *Are Elnicki's convictions for rape and aggravated criminal sodomy supported by sufficient evidence?*

Although we are reversing and remanding for a new trial, we must also address Elnicki's argument that insufficient evidence exists to support his convictions. As we stated in *Pabst,* 268 Kan. at 512:

"Because we have decided that the prosecutor's misconduct denied Pabst a fair trial, we must also address Pabst's sufficiency of the evidence argument. '[A] reviewing court must consider all of the evidence admitted by the trial court in deciding whether retrial is permissible under the Double Jeopardy Clause.' *Lockhart v. Nelson,* 488 U.S. 33, 41, 102 L. Ed. 2d 265, 109 S. Ct. 285 (1988); see *Burks v. United States,* 437 U.S. 1, 11, 57 L. Ed. 2d 1, 98 S. Ct. 2141 (1978)."

Our standard of review for the issue is well known:

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Remmers*, 278 Kan. 598, Syl. ¶ 1, 102 P.3d 433 (2004).

This standard and the standard for determining whether error is harmless or reversible in issues two and three both consider the evidence in the record. The standard of review of the present issue, however, requires considerably less evidence to sustain the convictions than the amount required to establish the harmlessness of any error. Accordingly, in *Pabst* we concluded that evidence of premeditation was sufficiently convincing under the standard of review to support the conviction, but not overwhelming so as to prevent reversal and remand for new trial on the basis of prosecutorial misconduct. See *Pabst*, 268 Kan. at 511.

The Court of Appeals thoroughly addressed Elnicki's sufficiency of the evidence argument and rejected it. It stated in relevant part:

"After pointing out all the consistencies of the evidence supporting a consensual encounter, Elnicki argues that even if the evidence is viewed in the light most favorable to the State, the evidence did not support his convictions. We disagree. Elnicki is asking us to find there is no way a reasonable jury could find him guilty based on the inconsistencies of J.A.'s testimony. He also presents his version as what must be accepted. The jury sorted through all the inconsistencies claimed by Elnicki and found J.A.'s story to be the more credible — that is the jury's responsibility. This court does not weigh conflicting evidence, pass on credibility, or redetermine questions of fact. [Citation omitted.]. We find there is sufficient evidence to support Elnicki's convictions. While a set of facts may be so improbable as to be insufficient to support a conviction, see *State v. Matlock*, 233 Kan. 1, 660 P.2d 945 (1983), that is not the case here." 32 Kan. App. 2d at 276.

We agree with the Court of Appeals holding. Reviewing all of the evidence, viewed in the light most favorable to the State, we conclude beyond a reasonable doubt that there was sufficient evidence to support the convictions in this case. Accordingly, the decision of the Court of Appeals is affirmed on this issue. The remaining issues on appeal are moot.

The decision of the Court of Appeals affirming the district court is reversed. The decision of the district court is reversed and the case is remanded for new trial.

LUCKERT, J., not participating.
LARSON, S.J., assigned.