(157 P.3d 660)
No. 95,144

STATE OF KANSAS, *Appellee*, v. DAMION LA MARK JACKSON, *Appellant*.

Opinion filed May 11, 2007.

*Korey Kaul* and *Virginia A. Girard*, of Kansas Appellate Defender Office, for appellant.

*Jerome A. Gorman*, district attorney, and *Phill Kline*, attorney general, for appellee.

Before PIERRON, P.J., MALONE and BUSER, JJ.

MALONE, J.: Damion La Mark Jackson appeals his convictions of two counts of attempted first-degree murder and one count of aggravated battery. Jackson claims he was denied a fair trial based upon prosecutorial misconduct during closing argument. Specifically, Jackson argues the prosecutor improperly defined reasonable doubt and made improper comments concerning Jackson's credibility as a witness. We agree with Jackson that the prosecutor's remarks were improper, but we conclude the misconduct did not deny Jackson a fair trial.

On March 26, 2006, Nicole Schmidt took her two children to Jackson's house so that Jackson, who was her ex-boyfriend and the children's father, could watch them. Jackson lived with his mother, Marva Jackson. While at Jackson's house, Schmidt and Jackson got into a heated argument. The argument began on Jackson's porch and eventually moved into the street. Schmidt attempted to leave with her children, but Jackson would not let her leave and continued to argue with her. At one point, Jackson either hit or pushed Schmidt, who was holding the youngest child, and made her fall down. According to Schmidt, throughout the argument Jackson told her that if she called the police, he would shoot her, the police, and himself. A neighbor saw the argument and called the police.

Officers Phillip Trusskey and Ryan Fincher arrived at the scene. As the police vehicles were turning onto Jackson's street, Jackson went back into his house. Trusskey arrived on the scene first and approached Schmidt to investigate the domestic disturbance call. Schmidt told Trusskey that she wanted to leave and complete the criminal investigation at a later time. Trusskey allowed Schmidt to

leave with her two children, and Trusskey and Fincher approached the house.

When Fincher reached the house he encountered Marva and spoke to her on the front porch. While talking to Marva, Fincher heard what he believed to be one muffled gunshot coming from inside the house. Upon hearing the gunshot, Marva started yelling, believing that Jackson had killed himself. After the gunshot, the officers attempted to enter the house. Fincher saw Jackson carrying a rifle, and Jackson began shooting. Both Fincher and Trusskey took cover and returned fire. After firing approximately 30 shots, Jackson stopped shooting and surrendered to the police.

Fincher was shot once in the shin, once in the knee, once in the hip, and suffered a shrapnel injury to his shoulder. Trusskey suffered two gunshot wounds to his legs. Jasmine Hernandez, Jackson's daughter from another relationship, who was on the porch at the time of the shooting, sustained one bullet wound to her left leg.

Jackson was charged with two counts of attempted first-degree murder of the police officers and one count of aggravated battery of Hernandez. At trial, Jackson testified he did not intend to harm anyone but himself. He claimed he wanted to commit suicide by forcing the police to shoot him. Jackson testified he fired his weapons toward the ground so he would not hit anyone. According to Jackson, he wore a bulletproof vest so that the police would shoot him in the head. Jackson testified he stopped shooting because he had an out-of-body experience. He claimed there was a good angel and a bad angel with him, and the good angel told him to stop shooting. After hearing the evidence, the jury found Jackson guilty as charged. He timely appeals.

Jackson claims the prosecutor made improper comments during closing argument that prejudiced him, denying his constitutional right to a fair trial. An appellate court's review of an allegation of prosecutorial misconduct requires a two-step analysis. First, an appellate court decides whether the prosecutor's comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, the appellate court decides whether those comments constitute plain error; that is, whether the comments

prejudiced the jury against the defendant and denied the defend-
ant a fair trial. If the prosecutor's comments rise to the level of
denying the defendant a fair trial, reversal is required. *State v.
Elnicki*, 279 Kan. 47, 58, 105 P.3d 1222 (2005).

Jackson complains the following comments, made by the pros-
ecutor during closing argument, were improper and prejudicial:

*"Whew, he gave you two doozies, didn't he? One he wanted to die, suicide by
police, but only in the head because he didn't want it to hurt. . . . The other part
of his doozie of a statement is the out-of-body experience, the good angel and the
bad angel sitting on him.* One of the early instructions the Court gave you says
that it is for you to determine the weight and credit to be given to the testimony
of each witness. You have the right to use that knowledge and experience which
you possess in common with men and women in general in regard to the matters
about which a witness has testified. *You have the right to go in there, ladies and
gentlemen, and say you know what, Damion Jackson, that was a crock. You want
us to believe that. It was a crock."*

. . . .

"Instruction Number 18 gives you the test, talks about reasonable doubt, and if
you take the double negatives out of that, what it says is *if you're reasonably sure
of the defendant's guilt, vote guilty."* (Emphasis added.)

Jackson argues that the prosecutor's comments (1) improperly
interjected a personal opinion on Jackson's credibility and (2) im-
properly defined reasonable doubt. Jackson did not object to the
prosecutor's comments at trial. Although a contemporaneous ob-
jection is generally required to preserve an issue for appeal, the
absence of a contemporaneous objection is not necessarily fatal to
a claim of prosecutorial misconduct during closing argument. If
the claimed error is determined to implicate a defendant's right to
a fair trial, an appellate court's standard of review is the same re-
gardless of whether an objection was made. *State v. Pabst*, 268 Kan.
501, 504, 996 P.2d 321 (2000).

### *Prosecutor's definition of reasonable doubt*

Jackson argues the prosecutor committed misconduct by mis-
stating the definition of reasonable doubt. During closing argu-
ment, the prosecutor referred the jury to the district court's in-
struction containing the appropriate test for determining
reasonable doubt. However, the prosecutor added the comment
that "if you're reasonably sure of defendant's guilt, vote guilty."

The reasonable doubt standard allows a jury to convict a defendant only if it has "no reasonable doubt as to the truth of each of the claims required to be proved by the State." PIK Crim. 3d 52.02. The Kansas Supreme Court has repeatedly stated that " ' " " '[N]o definition or explanation can make any clearer what is meant by the phrase "reasonable doubt" than that which is imparted by the words themselves.' " ' [Citations omitted.]" *State v. Wilson*, 281 Kan. 277, 287, 130 P.3d 48 (2006).

The State attempts to justify the prosecutor's definition of reasonable doubt as being similar to the definition approved in *State v. Shoemake*, 228 Kan. 572, 618 P.2d 1201 (1980). In *Shoemake*, the prosecutor suggested that the jury should convict the defendant if it had a "reasonable certainty" of the defendant's guilt. 228 Kan. at 578. The Kansas Supreme Court found that the prosecutor's definition was not reversible error, concluding that "we cannot say the prosecutor's statements exceeded the limits of fairness or were outside the considerable latitude allowed the prosecutor in arguing his case to the jury." 228 Kan. at 578. See also *State v. Mitchell*, 269 Kan. 349, 360, 7 P.3d 1135 (2000) (prosecutor's comment during closing argument defining reasonable doubt as "common sense" was improper, but not so gross and flagrant as to prejudice the jury against the defendant and deny the defendant a fair trial).

The State's reliance on *Shoemake* is unpersuasive. *Shoemake* was decided in 1980 before appellate courts began analyzing prosecutorial misconduct claims under the structured two-step analysis currently employed by the courts. Moreover, informing the jury it must have a "reasonable certainty" to convict the defendant is not the same as telling the jury it must only be "reasonably sure" of the defendant's guilt. Also, the court in *Shoemake* only found that the prosecutor's statement was not reversible error; the court did not approve the comment as being a correct statement of the law. 228 Kan. at 578.

Here, we have no difficulty concluding the prosecutor misstated the definition of reasonable doubt. The prosecutor's definition of reasonable doubt did not make the meaning of the phrase any clearer. Instead, the prosecutor's definition provided a diluted version of reasonable doubt. The prosecutor's statement was clearly

improper and went beyond the wide latitude that a prosecutor is afforded during closing argument.

*Prosecutor's comments on Jackson's credibility*

Jackson also argues that the prosecutor improperly commented on his credibility by referring to his claims of an out-of-body experience and suicide by police as "doozies" and "a crock." Jackson claims the prosecutor's comments denied him his right to a fair trial.

Jackson relies on *Pabst*, 268 Kan. 501. In *Pabst*, the prosecutor accused the defendant of lying at least 11 times during closing argument. The Kansas Supreme Court noted that when faced with conflicting evidence, a prosecutor can reasonably argue that certain testimony is not believable:

"Inherent in this wide latitude is the freedom to craft an argument that includes reasonable inferences based on the evidence. When a case develops that turns on which of two conflicting stories is true, it may be reasonable to argue, based on evidence, that certain testimony is not believable. However, the ultimate conclusion as to any witness' veracity rests solely with the jury." 268 Kan. at 507.

However, the court concluded that accusing the defendant of lying "goes far beyond the traditional wide latitude afforded to prosecutors in closing argument." 268 Kan. at 507.

Other decisions stand for the proposition that a prosecutor's reference to the defendant as a liar, or the term's alleged euphemisms, is clearly improper. See *Elnicki*, 279 Kan. at 63-64 (finding that the prosecutor's references to the defendant's testimony as a "fabrication," a "fairytale," and a "yarn" were improper); *State v. Lockhart*, 24 Kan. App. 2d 488, 492, 947 P.2d 461, *rev. denied* 263 Kan. 889 (1997) (finding reversible error where the prosecutor suggested that both the defendant and defense counsel were lying to the jury). But see *State v. Baker*, 281 Kan. 997, 1014-15, 135 P.3d 1098 (2006) (prosecutor's statement that the defendant's story "defies physics, it defies logic, and it certainly defies common sense" was not improper); *State v. Blanchette*, 35 Kan. App. 2d 686, 707, 134 P.3d 19 (2006) (prosecutor's statement that for the jury to believe the defendant would require a "quantum leap" from the evidence was not improper).

Here, Jackson's credibility was an issue. If the jury believed Jackson's testimony, it could have convicted him of attempted second-degree murder or completely acquitted him of all charges. As stated in *Pabst*, when faced with conflicting evidence, a prosecutor can reasonably argue that certain testimony is not believable, as long as the argument is based upon the evidence and not personal opinion. 268 Kan. at 507. However, in this instance the prosecutor's use of the terms "doozies" and "a crock" amounted to a personal opinion about Jackson's credibility. These comments were improper.

### *Was the prosecutor's conduct plain error, which requires reversal?*

Because the prosecutor's comments concerning the definition of reasonable doubt and Jackson's credibility were improper, we must now determine whether these remarks constituted plain error under the second step of the analysis. See *Elnicki*, 279 Kan. at 64. When determining whether a new trial should be granted under the second step, an appellate court considers three factors:

"(1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. None of these three factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 [refusal to grant new trial is inconsistent with substantial justice] and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) [conclusion beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial], have been met." *State v. Tosh*, 278 Kan. 83, Syl. ¶ 2, 91 P.3d 1204 (2004).

We will first examine whether the prosecutor's misconduct was gross and flagrant and whether the misconduct showed ill will on the prosecutor's part. The term "ill will" has not been defined by the Kansas appellate courts in the context of prosecutorial misconduct. However, we know that ill will must be something more than "gross and flagrant" conduct, because these are considered separate factors in the analysis.

We believe the prosecutor's definition of reasonable doubt constituted a flagrant misstatement of the proper definition of this term. However, this misstatement occurred only one time in the entire closing argument. Also, the prosecutor drew the jury's attention to the correct instruction given by the district court. These facts weigh in favor of finding no ill will by the prosecutor. We note that in oral argument before this court, even defense counsel conceded there was probably no ill will on the prosecutor's part in misstating the definition of reasonable doubt.

The prosecutor's comments on Jackson's credibility are problematic. However, these statements were made in reference to Jackson's testimony about his "out-of-body experience" and "the good angel and bad angel" telling him what to do. Also, the comments were isolated, and at the time the comments were made the prosecutor also directed the jury's attention to the correct instruction concerning witness credibility.

Jackson's case is distinguishable from *Elnicki* where the court found the prosecutor's comments during closing argument about the defendant's "yarns," "fairytales," and "fabrications" constituted reversible error. In *Elnicki*, the prosecutor's comments were not isolated but were made throughout the entire closing argument. The prosecutor in *Elnicki* was also guilty of bolstering the credibility of the State's witnesses. Furthermore, the primary reason the court reversed the defendant's convictions in *Elnicki* was because the district court erred in allowing the jury to view the defendant's videotaped statement where a police detective repeatedly called the defendant a liar. Even under these circumstances, the court determined that reversal of the defendant's conviction based on prosecutorial misconduct was a "close call." *Elnicki*, 279 Kan. at 67. We conclude the prosecutor's comments on Jackson's credibility were not as flagrant as the comments in *Elnicki* and did not display the level of ill will that was evident in that case.

Turning to the third factor, the evidence against Jackson was substantial, if not overwhelming. The only evidence which supported Jackson's theory of defense was his testimony about his state of mind at the time of the shooting and the fact that most of the victims' wounds were to the legs. Jackson, however, failed to tell

the police when they were questioning him about either his suicidal thoughts or his out-of-body experience.

There was ample evidence supporting the State's theory that Jackson acted intentionally and with premeditation. According to Schmidt, throughout the argument, Jackson told her that if she called the police he would shoot her, the police, and himself. Also, the uncontroverted evidence showed that when Jackson saw the police vehicles turning onto his street, he went into his house, put on two bulletproof vests, and grabbed two guns and a bag of ammunition. Jackson fired more than 30 shots at the two officers, who each suffered numerous gunshot wounds. Jackson's actions of threatening to kill the police, running into the house to get weapons upon seeing the police, wearing bulletproof vests, shielding himself from gunfire, and firing more than 30 rounds of ammunition provided overwhelming evidence that Jackson acted intentionally and with premeditation. Thus, the prosecutor's improper comments likely had little weight in the minds of jurors.

There are factors that make this a close case. The prosecutor's definition of reasonable doubt was clearly improper and constituted misconduct. The comments about Jackson's credibility were also improper. Under some circumstances, this misconduct could have resulted in reversible error. On the other hand, we note that Jackson's jury trial lasted 4 days. Twenty witnesses testified and over 150 exhibits were admitted into evidence; yet the proceedings were apparently so error free that the prosecutorial misconduct claim is the only issue raised on appeal. Under the facts and circumstances of this case, we conclude the prosecutor's improper comments did not deny Jackson a fair trial requiring the reversal of his convictions.

Affirmed.