NOT DESIGNATED FOR PUBLICATION

No. 110,542

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DYLAN ROBERT CORYELL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Decatur District Court; PRESTON A. PRATT, judge. Opinion filed February 26, 2016.
Affirmed.

*Richard Ney*, of Ney & Adams, of Wichita, for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, and *Derek Schmidt*, attorney general, for
appellee.

Before HILL, P.J., BUSER, J. and WILLIAM R. MOTT, District Judge, assigned.

BUSER, J.:  Dylan Robert Coryell appeals his conviction and sentence for
intentional second-degree murder in violation of K.S.A. 2011 Supp. 21-5403(a)(1) and
aggravated battery in violation of K.S.A. 2011 Supp. 21-5413(b)(1)(B). The case returns
to us after a remand under *State v. Van Cleave*, 239 Kan. 117, 716 P.2d 580 (1986), for
an evidentiary hearing on numerous claimed instances of ineffective assistance of trial
counsel. Coryell also contends the district court erred by departing upward at sentencing.

1

Upon our reading of the parties' briefs, listening to their oral arguments, and reviewing the record on appeal, we affirm Coryell's convictions and sentences.

FACTUAL AND PROCEDURAL BACKGROUND

Dylan was a 24-year-old resident of Oberlin. At the time of this incident, he was in a sexual relationship with Sarah Campbell, who was also seeing Corey Cook. Sarah was staying with Dylan's close friends, Everett and Jordan Urban. Of note, Jordan had previously dated Corey.

In early October 2011, Corey was in town on leave from the Air Force. Sarah decided to tell Corey about her relationship with Dylan. Sarah testified that Corey broke up with her for a day, but they reunited.

Sarah testified that Dylan wanted an exclusive relationship with her but she was unsure of the status between them. Jordan testified, however, that Sarah told Dylan they would move in together. According to Jordan, Dylan believed Sarah. Dylan did not testify at trial.

While Corey was on leave, he stayed with a friend, Ryan McEvoy. During this time, Sarah moved into Ryan's residence to be with Corey but she told Jordan she was staying with her parents. Sarah testified that she lied because Jordan did not approve of her relationship with Corey, an attitude Sarah attributed to jealousy. When Jordan learned of Sarah's duplicity, she told Sarah to move out.

On the evening of October 15, 2011, Corey, Sarah, and some friends were gathered at Ryan's rural residence to drink and shoot firearms. At the same time, Dylan, Everett, Jordan, and Killian Dellere, a friend of Dylan and Everett, were partying at the residence of Andrew Richards. This group was also drinking.

2

The two groups sent hostile text-messages to each other throughout the evening. As Killian described it at trial, "there was an argument between [Corey] and Jordan . . . . [Corey] was calling her names and such. And there was also an argument between Dylan . . . and [Corey] over Sarah." Everett was angry that Corey had called his wife a "whore." On the other hand, Sarah told Everett, who had previously attempted suicide with a shotgun that Corey said he would provide a shotgun with a note: "'Don't miss this time."

The dispute escalated, whereupon Everett and Dylan arranged to fight Corey at a neutral location. According to Everett, the fight was to be between himself and Corey, with Dylan attending to provide protection in case Corey brought others. Corey did not show up, however, so Everett and Dylan returned to Andrew's residence.

The text-messages continued, and Everett and Dylan remained angry. At some point, Corey sent text-messages to Everett inviting him to Ryan's residence. Corey also texted his father, who went to Ryan's residence in an attempt to stop any confrontation.

When no one had appeared at Ryan's residence by about 1 a.m. on October 16, 2011, Corey's father left. Everett then texted Corey that he was on the way over to the residence. Corey and Sarah had gone to bed, however, and Sarah had turned off their phones.

At about 1:30 a.m., Everett, Dylan, and Killian arrived at Ryan's residence. The front door was open, and Killian could see Dakota Cook, Corey's brother, asleep on a recliner. A diagram and photographs of Ryan's residence were introduced into evidence at trial, but they are omitted from the record on appeal along with the rest of the trial exhibits.

Everett, Dylan, and Killian entered the residence, woke Dakota, and asked him where Ryan and Corey were in the house. Dakota said he did not know and went back to

3

sleep. Everett testified that he noticed a .410 shotgun leaning against a wall, and he inspected it to verify it was unloaded. Everett said he checked the shotgun based on earlier text-messages from Corey saying things such as, "I love killing people," and "I will kill you." According to Ryan, a box of shells was located on the top of a gun cabinet near the .410 shotgun.

Everett, Dylan, and Killian continued their inspection of the residence, looking into bedrooms and finding persons asleep. They opened the door to one bedroom and found Corey and Sarah asleep together in a bed. We cannot be certain without reviewing the trial exhibits, but it appears from the testimony that the .410 shotgun and the gun cabinet were near the door to the bedroom where Corey and Sarah slept.

According to Everett, Dylan wanted to wake Corey and Sarah, but Everett said he opposed the idea. Everett testified: "We just argued about waking him up and getting in a fight, and it got pretty bad—bad enough I got pushed." Everett decided to leave and he told Dylan: "'If you're not in the vehicle by the time I get there, I'm leaving you here."

According to Killian, all three men decided to leave, and he took the lead out the front door. Everett testified that as he walked out behind Killian, "I turned the corner of the hallway, out of the corner of my eye, I notice [Dylan] had a gun." Everett said it appeared to be the .410 shotgun he had inspected.

Everett testified that he observed Dylan aiming the shotgun "[i]n the bedroom," but he thought Dylan was just "messing around, being stupid." About the time he had reached the front door, however, Everett testified to hearing a shot. On the other hand, Andrew testified that after the shooting, Everett told him he was "right beside" Dylan when the shot was fired.

Both Everett and Killian testified that Dylan ran out of the residence. Everett said he asked Dylan what happened, and Dylan answered: "'I don't know." Andrew testified to calling Everett's phone at that time and hearing an on-going conversation between Everett and Dylan. According to Andrew, Everett asked: "'Why did you do that? How could you do that? Why did you pull the trigger? Why did you do that?'" In reply, Dylan stated: "'I'm going to jail,' over and over again."

Corey was killed when he was struck in the head by a shotgun blast. Forensic testing showed the pellets were fired from the .410 shotgun in the residence. A pathologist testified that the pattern of the shot indicated the shotgun was fired from the doorway of one bedroom.

Sarah was struck in the back by a shotgun pellet. She awoke and, after failing to wake Corey, ran from the residence. Outside, Sarah testified that she spoke with Dylan: "I just kept asking him what he did, and he replied by saying that it was all his fault and he needed to go kill himself." Dylan called 911 twice after the shooting, and recordings of these calls were admitted in evidence. The recordings are not included in the record on appeal.

Troy Haas, an Oberlin police officer, was dispatched to Ryan's residence at about 1:47 a.m. Officer Haas asked Killian who had shot Corey. Killian told the officer that Dylan was the shooter. Officer Haas also testified about Everett's statement at the scene:

> "He said he was in the residence and handling a gun, and he set it down and then Dylan, who he said was drunk, picked up the gun, began playing with it and pointing it. At that time Everett told me he wanted to leave. He also told Killian he wanted to leave. He heard a gunshot and ran outside of the residence."

At about 3:19 a.m., Officer Haas transported Dylan to the county jail. The officer placed Dylan in a cell and informed him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, *reh. denied* 385 U.S. 890 (1966). At 4:26 a.m., Mark Kendrick, a Special Agent with the Kansas Bureau of Investigation, conducted an interview with Dylan. Agent Kendrick again informed Dylan of his *Miranda* rights and asked him if he would waive his rights. Dylan waived his rights and consented to the interview which lasted until 6:30 a.m.

The interview of Dylan was recorded, but because of a technical problem it produced a "jerky" video image with essentially no audio. Because a separate audio recording had also been made, however, the two recordings were merged together, producing a version with both audio and video. The three versions of the recording were admitted in evidence at trial but were not included in the record on appeal. However, Dylan did produce an interview transcript as evidence at the *Van Cleave* hearing.

The transcript shows that Dylan told Agent Kendrick that someone at Ryan's residence, he was not sure whom, "had been digging around in the gun cabinet" and then "just tossed me a gun." Dylan said, "I just caught the gun and it went off." Dylan maintained: "It was a freak accident. I would never shoot anybody."

At about 6:30 a.m., a blood test showed that Dylan's blood alcohol content was .18. Agent Kendrick testified that Dylan's blood alcohol content would probably have been higher both at the time of the shooting and when Dylan waived his *Miranda* rights. The agent also testified that behavior varies among people with the same blood alcohol content: "It depends on their tolerance for alcohol. If they've done a lot of drinking, then they're more tolerant to the alcohol that's in their system. If they haven't done a lot of drinking, then they're not as tolerant."

6

On October 18, 2011, the State charged Dylan with one count of first-degree premeditated murder, or in the alternative, felony murder in the first degree, one count of aggravated battery, and one count of aggravated burglary. Dylan's family retained Justin A. Barrett as defense counsel, and he and Calvin K. Williams each entered an appearance on Dylan's behalf.

On March 18, 2013, the trial court conducted a full day of voir dire. After the State's case-in-chief, the trial court granted Dylan's motions for directed verdict on the alternative felony murder charge and the aggravated burglary charge. On March 27, 2013, the jury found Dylan guilty of second-degree intentional murder as a lesser included offense, and aggravated battery.

Dylan filed this appeal. While the appeal was pending, he moved our court to remand the case to the district court for a *Van Cleave* hearing regarding ineffective assistance of counsel. We granted Dylan's motion.

On remand, the same district judge who had made the pretrial rulings and conducted the jury trial heard 2 1/2 days of testimony from 19 witnesses. The district judge then filed a detailed 39-page memorandum decision and order denying Dylan's motion. Dylan appeals.

INTRODUCTION

At the outset of our analysis, it is important to note that Dylan's ineffective assistance of counsel claims are not presented as a K.S.A. 60-1507 proceeding as the trial court indicated on remand and as Dylan assumes on appeal. We have rejected a "suggestion that [a] motion to remand for a *Van Cleave* hearing in the direct appeal is to be construed as a [K.S.A. 60-]1507 motion." *Rice v. State*, 37 Kan. App. 2d 456, 461, 154 P.3d 537, *rev. denied* 284 Kan. 946 (2007). "Although the subject of the remand hearing

7

was one ordinarily handled in a [K.S.A. 60-]1507 motion, the proceedings were nevertheless part and parcel of the direct criminal appeal." 37 Kan. App. 2d at 461.

Next, we state our standard of review: When a trial court has conducted an evidentiary hearing on ineffective assistance of counsel claims, we review any factual findings for substantial competent evidence and decide whether those findings support the trial court's conclusions of law. *State v. Betancourt*, 301 Kan. 282, 306, 342 P.3d 916 (2015). We review the trial court's conclusions of law de novo. 301 Kan. at 306.

In considering the various Sixth Amendment claims of attorney ineffectiveness raised by Dylan in this appeal, a two-part test will be applied: "The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel. In testing if this right has been violated, courts use the two-prong test stated in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984)." *Betancourt*, 301 Kan. 282, Syl. ¶ 13. "Under the first prong, a defendant must demonstrate that counsel's performance was deficient." 301 Kan. at 306. Under the second prong, the defendant must demonstrate "a reasonable probability that, without counsel's unprofessional errors, the result would have been different." 301 Kan. at 306. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

As a final introductory matter, it is necessary to clarify the respective legal assistance provided by the two attorneys who represented Dylan in the district court, Barrett and Williams. Each lawyer entered his appearance as Coryell's "co-counsel." But since they were not operating as a team during the court proceedings, with Barrett doing

8

nearly all the courtroom work and Williams absent for part of the trial and the entirety of other hearings, it is necessary to determine whose assistance is in question here.

Barrett was admitted to the bar in 2004, works in Colby as a solo practitioner, and served one term as Cheyenne County Attorney. Barrett had not tried a homicide case before accepting Dylan's representation. Williams was admitted to the bar in 1978, worked as a solo practitioner, and served one term as Osage County Attorney. Williams has tried four or five homicide cases in his career.

The evidentiary hearing established that Barrett and Williams had different responsibilities for the defense. Barrett testified he told Dylan, "he would be retaining me, but at some point, I would be consulting with Mr. Williams throughout the course of the trial, and that he would be assisting me with the defense." Barrett explained to Dylan, "it would be an advisory [relationship] . . . if I had any questions, I would be consulting with [Williams]. If they had any questions that I couldn't answer, we could look to him as more experienced in this area."

Williams was in Barrett's view, an attorney to "bounce ideas off of." Williams characterized the cooperative relationship with Barrett in a similar manner:

> "And basically, I tried to play as a sounding board to him, and I tried to play the devil's advocate. When he would take a position, we'd sit at the office and I would come from a different angle. Like he'd tell me what he thought he wanted to get out of a witness, and I would take the witness's statement and I would testify a little differently and put a slant on it. Those kinds of things to help him figure out how to approach things that, you know, solo practitioners don't have that and people in partnerships do."

Williams' sole assignment at trial was to question the State's weapons expert. A review of the record located only one other instance in which Williams spoke in court. At

some court hearings, such as the preliminary examination, Barrett appeared as counsel without Williams' in-court assistance.

A review of the record also found no filings signed by Williams aside from his entry of appearance. Williams was typically not served by the State. For example, he was not served with the pretrial questionnaire. This was true also of the trial court, which served most of its orders solely on Barrett. The trial court listed Barrett alone as Dylan's counsel in the journal entry of judgment, although it did list both defense counsel in the journal entry of the trial. Finally, Williams was not paid for his legal services.

We conclude from these circumstances that while Williams was an advisor to Barrett, Barrett was the counsel who actually made the trial decisions, conducted the defense regarding pretrial proceedings, and principally represented Dylan in the courtroom during the actual jury trial. Although Williams questioned the State's weapons expert at trial, Dylan makes no complaint about that representation. Given the issues before us, therefore, we will focus our analysis on Barrett's actions and inactions. Dylan's several claims of attorney ineffectiveness will be individually reviewed.

INEFFECTIVE ASSISTANCE REGARDING EVIDENCE OF INTOXICATION AT TRIAL

Dylan contends he received ineffective assistance of counsel because Barrett failed to call expert witnesses to testify at trial about Dylan's intoxication at the time Corey was killed.

Prior to trial, Barrett consulted with two psychological experts, Mark D. Goodman, Ph.D., and David R. Mouille, Ph.D. regarding Dylan's mental state and his level of intoxication at the time of the killing. Ultimately, Barrett decided not to call either psychologist as an expert witness at trial.

10

After being retained, Dr. Goodman examined Dylan in the jail, conducted psychological testing and reviewed police reports prior to preparing an expert report for Barrett detailing his findings. Barrett ultimately decided, however, that the expert's opinions would not "be well received by a jury," and had the potential to harm the defense case.

In particular, Barrett thought the jury would be dismissive of expert testimony about Dylan's intoxication presented to excuse his responsibility for the shooting. Barrett grew up in Oberlin, has family in the area, and had a close familiarity with the residents. Barrett pointed to the demographics of the jury pool: "I knew that the . . . population of Decatur County has been gradually aging. . . . I mean we were looking at baby boomers or above." Barrett said that in his experience, and in "my discussions with other trial attorneys," older jurors would not readily accept expert opinions which tended to diminish individual responsibility due to intoxication: "[T]here is a certain accountability that they demand, or that's their way of thinking, in my experience." As a result, Barrett decided not to emphasize Dylan's lack of culpability based on a retained psychologist's view of the defendant's level of intoxication but simply make a common sense argument based on alcohol's effects on recollection of events—"everybody was drunk that night, so nobody knows really what happened."

Barrett was also concerned about Dr. Goodman's opinions regarding Dylan's psychological status. Dr. Goodman had conducted fairly extensive psychological testing of Dylan and opined in his report that Dylan "has significant passive-aggressive anger" and "strong bipolar features." Dr. Goodman concluded his report by stating that Dylan

> "will stuff his feelings until he is unable to hold them in any longer. This is most likely
> why he uses alcohol. At the time of the crime it is this examiner's opinion he drank very
> heavily to attempt to cover up anger he had towards [Corey] and [Sarah]. Of course, the

11

alcohol brought out the anger even more. His personality clearly shows he responds to psychosocial stresses by stuffing his feelings."

Barrett believed that if he called Dr. Goodman to testify about Dylan's intoxication, he would have opened the door to cross-examination on Dylan's psychological makeup. In this regard, Barrett was primarily worried about the doctor's characterizations of Dylan as explosively angry and bipolar, which would tend to support the State's theory of a premeditated or intentional killing. Barrett decided that Dr. Goodman's opinions on Dylan's mental state would conflict with the defense theory (based on Dylan's police interview) that the shooting was simply an unintended accident.

Barrett eventually decided, however, that in the event the jury did not accept Dylan's accident theory it should have the opportunity to consider a voluntary intoxication defense. Accordingly, Barrett elicited substantial non-expert evidence of Dylan's intoxication during the trial. He also requested a voluntary intoxication instruction and argued it to the jury.

As we understand Barrett's approach, he sought to avoid the potential pitfalls of emphasizing retained expert opinion testimony regarding intoxication, yet gain some benefit through the abundant lay testimony about Dylan's intoxication. In this way, the jury could consider intoxication as to culpability without raising an overt conflict with the defense's primary theory that the killing was accidental. As a result, although Barrett mentioned the voluntary intoxication instruction in closing arguments, he repeatedly returned to the police interview and Dylan's claim that the shotgun had discharged accidentally after someone tossed it to him.

The district court found Barrett had "valid strategic reasons not to call Dr. Goodman." "'Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate

12

the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Betancourt*, 301 Kan. at 306 (quoting *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 [1985]). Strategic choices made after a thorough investigation are virtually unchallengeable. *Betancourt*, 301 Kan. at 311.

Barrett's decision not to call Dr. Goodman was a strategic choice, made after a proper investigation and Dylan does not fault Barrett's investigation. Dr. Goodman's report carried the inquiry beyond intoxication and into Dylan's psychological state, potentially giving the jury a reason to believe that Dylan had intended or even premeditated the killing of Corey. Barrett's concern was especially valid given evidence of Dylan's extreme anger and adequate functioning despite his intoxication.

Cameron Weishapl, a friend of Dylan's, testified that during the party at Andrew's residence he heard Dylan say he wanted to kill Corey. Cameron said Dylan was "yelling" and "acting pretty mean." Despite Dylan's high blood alcohol content when tested, the State elicited testimony that Dylan's speech and coordination were not seriously impaired before the shooting. Barrett testified that even Dylan's family had agreed, after viewing the video of the police interview, that Dylan did not show significant impairment. Barrett explained during the *Van Cleave* hearing:

> "There were at least two to three instances on the tape where he corrects Special Agent
> Kendrick about the floor plan of the house. He seems to recall during the tape multiple
> things up until the point . . . where he went into the house. He didn't indicate any blackout
> periods during that time. So I think those hurt us."

Dr. Goodman also testified at the hearing, and his testimony tended to support Barrett's judgment. The following exchange is illustrative:

13

"Q.    You also indicated on direct that your opinion was his actions that night were mostly motivated by anger?

"A.    I believe so, yes. I believe that's right.

"Q.    And . . . you're saying, mostly indicated by anger as opposed to all these other things you're seeing, such as alcohol dependence and his limited intellectual judgment? Did I say that correctly?

"A.    That's fine. That's a good way to word it, or less than average intellectual judgment. Yes. I would agree with that."

Considering all the evidence at trial, Dr. Goodman's testimony could have undercut the voluntary intoxication instruction and even supported the State's theory of premeditated murder. Given the deferential standard applied to attorney performance at trial, Dylan fails to show Barrett performed deficiently here. The trial court did not err in finding that Barrett had strategic reasons not to call Dr. Goodman.

Next, we consider Barrett's failure to call Dr. Mouille as an expert witness regarding Dylan's intoxication. Barrett testified that he spoke to three attorneys about using an intoxication defense, and one of them had retained Dr. Mouille. This attorney who had retained Dr. Mouille was unsuccessful employing that defense. Barrett said based on this trial experience the attorney had "offered some tips as to when it might be successful," but "they didn't seem to fit our situation."

Still, Barrett sent Dr. Mouille some discovery materials. Dr. Mouille never interviewed Dylan but sent Barrett a letter which stated, in a conclusory fashion, that Dylan was too impaired to form intent. Similar to Barrett's trial strategy discussed with regard to Dr. Goodman, Barrett testified:  "We didn't use [Dr. Mouille] because we were not going to be putting forward a primary defense of intoxication."

As in the case of Dr. Goodman, Dylan does not show deficient performance. Although another counsel might have chosen differently, this was a strategic decision

14

formulated after an appropriate investigation. Barrett's strategy of focusing on the principal defense theory of an accidental shooting while not relying on expert psychological testimony to prove an intoxication defense was reasonable for the reasons previously explained.

Barrett also did not call a toxicologist to extrapolate Dylan's expected blood alcohol level at the time of the shooting or police interview from the .18 level found after the interview. Dylan argues this constituted ineffective assistance of counsel.

Barrett did not consult with a toxicologist. Instead, he relied on Dylan's .18 blood alcohol content and argued to the jury that it "[d]oes not take a rocket scientist to figure out that it was higher earlier."

At the *Van Cleave* hearing, Dylan produced testimony by Morris David Faiman, Ph.D., a professor at the University of Kansas. Dr. Faiman testified that Dylan's blood alcohol content would have been .219 at the time of the police interview and .279 at the time of the shooting. Dr. Faiman testified such levels would typically produce confusion, blurred vision, double vision, imbalance, and difficulty with memory.

The district court found that Dylan was not prejudiced by failing to retain a toxicologist. It reasoned the jury would have known from common experience that Dylan's blood alcohol level was higher before testing. The district court also believed the jury could have determined Dylan's "intoxication" from the evidence "without knowing the number of his blood alcohol content."

We agree with the district court. The effects described by Dr. Faiman—confusion, difficulties with vision, balance, and memory impairment are commonly known, typical symptoms of intoxication. The numbers derived by Dr. Fairman would not have added substantially to the jurors' lay understanding of the effects of intoxication. Of note, Dr.

15

Faiman did not provide a formula from which the jurors could have determined Dylan's actual functioning at .219 or .279.

"It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Dr. Faiman's proposed testimony, given the significant amount of lay testimony and evidence showing Dylan's intoxication and its effects, was cumulative in nature. The omission of toxicology testimony does not undermine our confidence in the outcome of the jury's verdict. Dylan does not show prejudice.

Our conclusion is buttressed by Dylan's omission of the trial exhibits from the record on appeal. For example, the State's evidence of Dylan's functioning while intoxicated included Dylan's 911 calls, which are omitted from the record. We cannot conduct a full evaluation of Barrett's decisions without considering the State's evidence which confronted him when planning Dylan's defense.

The lack of an adequate record also hampers our prejudice analysis more generally. For example, the jury had to evaluate Dylan's account of the shooting which he related during the police interview. Dylan's assertion that he caught the shotgun with the barrel pointed into the bedroom was the only defense explanation of why the weapon fired in Corey's direction. We are unable to fully consider the jury's verdict without the diagram and photographs of Ryan's residence, which could either support or call into question the likelihood of Dylan's account. We will continue to discuss prejudice in the following issues, but we believe Dylan has failed to designate a record affirmatively showing prejudice to his criminal defense. See *State v. Bridges*, 297 Kan. 989, 1001, 306 P.3d 244 (2013).

16

## INEFFECTIVE ASSISTANCE REGARDING EVIDENCE OF
## INTOXICATION AT THE SUPPRESSION HEARING

In a related issue, Dylan argues that Barrett was ineffective for failing to present expert testimony regarding Dylan's intoxication and its effect on his *Miranda* waiver. Dylan identifies the potential witnesses as Dr. Goodman or Dr. Mouille, a toxicology expert such as Dr. Faiman, and Officer Haas, who could have testified that Dylan was asleep or passed out and smelled of alcohol on the ride to the jail.

Barrett filed a pretrial motion to suppress Dylan's statement to Agent Kendrick. At the suppression hearing, Barrett presented no evidence but relied on cross-examination of Agent Kendrick. Barrett testified he did not produce evidence because "I thought it would be a waste of time," and "I didn't think that motion would be granted at all."

The district court did not rule on the performance prong of the *Strickland* test but did consider the prejudice prong. Since the district judge who conducted the *Van Cleave* hearing was the same judge who had ruled on Dylan's pretrial motion to suppress, he rhetorically asked whether he would have changed his suppression ruling given the additional evidence produced at the *Van Cleave* hearing. In each instance, the judge found "the result would have been the same."

On appeal, Dylan contends the district court applied the wrong legal standard in making its ruling. Both parties cite *Kimmelmann v. Morrison*, 477 U.S. 365, 375, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986), as the proper standard. The procedural stance in *Kimmelmann* was complex, but the relevant passage is found in a discussion of the relationship between Fourth Amendment search and seizure rights and Sixth Amendment effective assistance of counsel rights:

> "Where defense counsel's failure to litigate a Fourth Amendment claim competently is
> the principal allegation of ineffectiveness, the defendant must also prove that his Fourth

Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." 477 U.S. at 375.

In other words, the "Fourth Amendment claim is one element of proof of [the] Sixth Amendment claim." 477 U.S. at 375. Of course, the underlying claim on appeal here is a Fifth Amendment *Miranda* claim, not a Fourth Amendment search and seizure claim. See *State v. Appleby*, 289 Kan. 1017, 1050, 221 P.3d 525 (2009).

We find some guidance from a case the State cites, *Styers v. Schriro*, 547 F.3d 1026, 1031 (9th Cir. 2008), where the *Kimmelmann* framework was applied to counsel's failure to file a "motion to strike the entire venire" due to pretrial publicity. The United States Court of Appeals for the Ninth Circuit applied the logic of *Kimmelmann* to defense motions as a whole: "Generally, a defendant claiming ineffective assistance of counsel for failure to file a particular motion must not only demonstrate a likelihood of prevailing on the motion, but also a reasonable probability that the granting of the motion would have resulted in a more favorable outcome in the entire case." 547 F.3d at 1030 n.5.

We conclude that *Schriro's* broad application of *Kimmelmann* is appropriate here, especially because the present case deals with a suppression issue, unlike *Schriro*, but like *Kimmelmann*. The fact that Dylan sought suppression under the Fifth Amendment rather than the Fourth Amendment does not affect our analysis.

With regard to the present appeal, the district court previously had viewed the video recording of Dylan during the interview. As the district court noted, it "could determine for itself how [Dylan]'s drinking affected his ability to waive *Miranda* and to answer questions during the interview." The district court also considered Dylan's blood alcohol level of .18 which was tested at the conclusion of the interview. Additionally, the district court was able to evaluate the additional expert testimony about intoxication

presented at the *Van Cleave* hearing. Upon reconsidering the matter, the district court found that Dylan's suppression motion was not meritorious. Given the district court's determination, Dylan has not established the first prerequisite of prejudice—demonstrating a likelihood of prevailing on the motion. 547 F.3d at 1030 n.5.

In light of *Kimmelmann*, the State also pertinently observes that Dylan "does not challenge the merits of the [trial] court's suppression ruling on appeal." Dylan argues in reply that this court exercises de novo review on questions of law, and he "had a meritorious suppression issue." But the district court expressly held that Dylan's motion to suppress was not meritorious. If Dylan disagrees, he must argue the merits to us, especially considering that this is his direct appeal. See *State v. Kelly*, 295 Kan. 587, 593, 285 P.3d 1026 (2012) (noting a defendant could pursue a "claim of ineffective assistance of counsel for failing to preserve the suppression issue and then pursue the legal issue"); *Prater v. State*, 402 S.W.3d 68, 75 (Ark. 2012) ("When alleging ineffective assistance of counsel for failing to preserve an issue for direct appeal, the petitioner must show that there was a meritorious basis upon which counsel could have filed a motion or made an objection.").

Since Dylan does not argue the merits of the suppression ruling, we will not consider them. See *State v. Boleyn*, 297 Kan. 610, 633, 303 P.3d 680 (2013) (issues not briefed are waived or abandoned on appeal). Upon its review at the conclusion of the *Van Cleave* hearing, the district court said it would have ruled the same way, overruling Dylan's suppression motion even with the additional expert evidence regarding intoxication. That judicial decision remains unchallenged on appeal. Dylan, therefore, is unable to show prejudice from any of Barrett's actions or omissions regarding Dylan's motion to suppress his statements made to Agent Kendrick.

19

Next, Dylan claims his counsel was ineffective for "failing to present any evidence, other than media reports, in support of his motion to change venue, and in failing to renew the motion to change venue." In particular, Dylan argues it was ineffective for Barnett not to commission a public opinion survey of "jury eligible people in Decatur County" to determine the source and extent of their knowledge regarding the case.

Barrett filed motions to change venue on May 26, 2012, (about 10 months before trial) and again on October 3, 2012, (about 5 months before trial). On appeal, Dylan contends that Barrett's first motion was "supported only by media reports." Yet, our review shows that Barrett also proffered facts at the first hearing in support of a change of venue, including the small size of the community, Corey's involvement in the community, the size of Corey's funeral, and the existence of tee-shirts and a Facebook group related to Corey's death.

The trial judge denied Barrett's first motion on the basis that actual bias could not be shown until voir dire was conducted:

> "You know, in situations like this, where you have such a small community, it's really, again I want to emphasize, it's not the knowing or knowing of the case, it's being able to, if you're on the jury, only listen to the evidence as presented in court and base your decision upon what's presented in court.
>
> "At this point, we just simply don't know whether or not . . . the citizens of Decatur County will or will not be able to put aside any preconceived notions they may have, if any, and whether or not they will be able to base their opinion only upon what's presented in court. So the defendant's Motion for Change of Venue is denied, unless during the jury selection process, the citizens of Decatur County, after questioning by both counsel and questioning by the Court, would indicate that they cannot set aside any

opinions, or cannot ignore any rumors or news articles they may have heard, or cannot be fair and impartial.

After the district court denied Barrett's first motion for change of venue, questionnaires were sent out to prospective jurors. Barrett renewed his motion to change venue but this time he relied on the responses from the juror questionnaires. At the second change of venue hearing, the district court reviewed the questionnaires and excused 35 potential jurors. The district judge acknowledged that the answers of another 20 individuals raised questions, but he still denied the motion:

> "But even if all those 20 need to be excused as well, that leaves at least 98 that would be coming in to be questioned. *Just based upon their responses on the jury questionnaires, it appears that they could be fair and impartial.*
> . . . .
> "So at this point, I think it would be premature for me to find that the defendant would not be able to get a fair and impartial trial here in Decatur County, so I am . . . going to deny the Motion to Change Venue." (Emphasis added.)

On February 26, 2013, (about 3 weeks before trial) Barrett filed a motion challenging 22 prospective jurors for cause. The State responded, conceding some of Barrett's challenges and objecting to others. Ultimately, the district court excused 7 of these individuals and excused 1 more based on personal hardship. The district court ordered the remainder to appear for voir dire.

At trial, voir dire was lengthy and detailed, encompassing 321 pages of transcript. Barrett eventually passed the jury panels for cause without renewing his motion to change venue for a third time.

At the *Van Cleave* hearing, Dylan produced affidavits from 33 residents of Decatur County, including 4 who were jurors, stating that, in their opinion, the trial

should have been changed to another venue. The funeral director authenticated a guest book from Corey's services with the names of 772 individuals. Photographs were introduced of a tee-shirt and bracelet made in commemoration of Corey, and testimony was elicited that these and similar items were seen in the community, including in the courthouse. Facebook postings by a juror, A.B., were produced, and she testified about them. Thomas Beisecker, Ph.D., a professor at the University of Kansas, testified to the need for a jury survey estimated to cost from $10,000 to $12,000.

During the *Van Cleave* hearing, Barrett insisted a jury survey "would have the opposite effect in Decatur County." Emphasizing his familiarity with the Oberlin community, Barrett explained:

> "If, for example . . . a juror or potential juror was surveyed and they gave answers that they didn't know anything about the particular case, the next thing that would happen in Decatur County is that person, that potential juror would run out and ask the coffee shop people, 'What's all this about?' And then it would instantly be prejudice against [Dylan]."

In Barrett's opinion, the juror questionnaires were superior to a survey:

> "We had a very detailed jury questionnaire. . . . There were 280-some juror questionnaires sent out, and of a population of Decatur County, we were getting, I think, more than ten percent of the population, or somewhere close to that, so it was essentially a sampling of the population anyway.
>
> . . . .
>
> "The jury questionnaire has specific court admonitions not to discuss it, and whether some people do or not, the survey would not have the same power and authority that came with it that says, 'Do not discuss this,' as part of it."

The district court found Barrett was not ineffective at either change of venue hearing. The district court noted that Barrett had proffered many of the facts proved on

22

remand, such as the size of Corey's funeral services, the tee-shirts, and the existence of Facebook postings. The district court also indicated that it was personally aware of the tee-shirts and bracelets at the time of the second hearing. The district court concluded, "Barrett was not deficient in failing to provide details of that information."

With regard to a jury survey, the district court indicated that such a survey would not have changed its previous determination to decide the venue issue only after hearing from prospective jurors during voir dire:

> "A survey would have cost $10,000—$12,000 and . . . even if a survey had been conducted the change of venue would not have occurred without assembling a jury pool, conducting voir dire, and attempting to find twelve jurors within Decatur County who could lay aside his/her impression or opinion and render a verdict based on the evidence presented in court and the law as instructed."

On appeal, our question regarding the performance prong is whether, "in light of all the circumstances," Barrett's "acts or omissions were outside the wide range of professionally competent assistance." *Strickland v. Washington*, 466 U.S. 668, 690, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984) . In making this evaluation, we must "recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690.

Dylan argues that Barrett failed to produce evidence at the first change of venue hearing, but it appears the district court considered Barrett's proffers. When the district court said Barrett's arguments were "based . . . upon mere speculation," and that "[t]here has been no evidence and no demonstrable facts presented to the court to satisfy this court that venue should be changed," the court was not referring to the proffers of facts. The district court was referring to its intent to wait until voir dire to see whether impartial venirepersons were sufficiently available to be sworn and serve as jurors.

23

Prior to the second hearing on Dylan's renewed motion, Barrett shifted his focus to the juror questionnaires which, considering the trial court's prior ruling, was certainly reasonable. We also believe it was not inappropriate for Barrett to not commission a jury survey given the potential problem of prejudicing the jury pool which he described during the *Van Cleave* hearing. See *Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."); *Flynn v. State*, 281 Kan. 1154, 1166, 136 P.3d 909 (2006) (where trial counsel used jury questionnaires rather than a survey, counsel "was responsible for making tactical decisions, including the best way to poll jurors regarding publicity"). Dylan does not show that Barrett performed deficiently in his particular approach to changing the trial's venue. The record supports the district court's finding that Barrett was not ineffective in this regard.

With regard to the prejudice prong, the district court ruled that Dylan "failed to show there is a reasonable probability of a different outcome." It is notable that Dylan did not conduct a jury survey for purposes of the *Van Cleave* hearing. Dr. Beisecker testified that a posttrial survey was not possible due to "hindsight bias" and other problems.

As in the prior issue, Dylan does not show prejudice. Dylan complains that Barrett produced insufficient evidence at the hearings on change of venue, and that when Barrett passed the jury panels for cause, he lost an opportunity to develop the evidence. But the State again responds that the district court "ruled that, had [more evidence been provided], it still would have proceeded to the jury selection regardless, in order to see if there would be difficulties in selecting a jury; thus, the outcome would not have been different."

In his reply brief, Dylan asserts that Barrett's failure to renew the motion to change venue at voir dire, "effectively waived the issue for appellate review . . . *as the State would have certainly argued if the issue had been presented directly on appeal*."

24

(Emphasis added.) We take this as an admission by Dylan that he does not argue the underlying merits of the venue issue. And Dylan does not enable us to consider the district court's venue ruling by briefing the merits of the district court's ruling declining to change the venue of the trial. Since venue in Decatur County remains unchallenged in this appeal, Dylan does not show actual prejudice from any of Barrett's acts or omissions regarding his motions for change of venue.

INEFFECTIVE ASSISTANCE IN CONDUCTING VOIR DIRE

Dylan argues that Barrett's "inadequate voir dire and failure to make appropriate challenges for cause prejudiced [him] because it denied [his] Sixth Amendment right to an impartial jury." Dylan identifies 10 jurors who he claims should have been challenged for cause. He argues that these prospective jurors were biased or prejudiced due to their relationship, acquaintance or knowledge of Corey, or certain trial witnesses. The State responds that defense counsel is given wide latitude to exercise professional judgment regarding voir dire and that Dylan has failed to show that any juror was actually biased against him.

The district court's memorandum decision addressing this particular issue is 10 pages in length, 8 pages of which discussed in detail the questionnaire and voir dire responses provided by the individual jurors Dylan complained about. Upon its review of the responses, the district court found:  "Each juror stated he/she could lay aside his/her impression or opinion and render a verdict based on the evidence presented in court." Substantial competent evidence supports the district court's factual findings. After the district court made its factual findings, it ruled that Dylan had failed to establish either the performance or the prejudice prong of the *Strickland* test.

With regard to the performance prong, Barrett testified that he did not challenge certain prospective jurors because, in his opinion, the district court would not strike the

25

jurors for cause, and he did not wish to alienate the jury panel in his failed attempts at striking certain prospective jurors. Barrett believed that whatever problems the juror questionnaires and voir dire had uncovered, "when [the jurors] were rehabilitated by both the State and the Court, there was no way they were going to be dismissed, in my opinion."

Our court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. This court may not ignore that the district court essentially confirmed Barrett's judgment by ruling at the conclusion of the *Van Cleave* hearing that Dylan "failed to meet his burden that even if these jurors had been challenged there is a reasonable probability they would have been removed for cause." Given the district court's ruling, nothing would have changed if Barrett had conducted the voir dire differently, as Barrett had correctly surmised.

The State argues that Barrett was operating within "the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The State's position is supported by a case Dylan cites on appeal, *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001):

> "Counsel is also accorded particular deference when conducting *voir dire*. An attorney's actions during *voir dire* are considered to be matters of trial strategy. . . . A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness. [Citations omitted.]"

We are persuaded that Dylan has failed to show that Barrett's voir dire was constitutionally infirm or that his failure to challenge for cause certain jurors was also ineffective. The district court's detailed findings regarding the prospective jurors' answers

26

on their questionnaires and on voir dire do not show that any prospective juror was subject to challenge for cause due to actual bias.

Next, assuming that Barrett was ineffective during voir dire, we consider the second prong of the Strickland test—prejudice.

The prejudice analysis is different on this issue because of the legal standard. Dylan cites *Hughes*, 258 F.3d at 458, which applied an actual bias standard when examining prejudice based on deficient performance in voir dire. Kansas cases have taken a similar approach. In *Bledsoe v. State*, 283 Kan. 81, 103-04, 150 P.3d 868 (2007), where the defendant argued trial counsel "failed to conduct a meaningful voir dire," our Supreme Court held the defendant had failed "to show that a biased or prejudiced juror was selected or that there was any member of the panel who should have been excused." In *State v. Ji*, 251 Kan. 3, 832 P.2d 1176 (1992), similarly, the defendant argued that trial counsel was ineffective during voir dire. Our Supreme Court rejected the arguments summarily: "We note Ji fails to identify one person who should have been excused from serving on the jury." 251 Kan. at 13.

Actual bias is, however, a facially different standard than *Strickland*'s reasonable probability standard. The United States Court of Appeals for the Eleventh Circuit has opined that the standards are "arguably consistent." *Owen v. Florida Dept. of Corrections*, 686 F.3d 1181, 1201 (11th Cir. 2012).

> "To 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,' *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068, Owen must show that at least one juror was biased; if no juror were biased, then there is no 'reasonable probability that . . . the result of the proceeding would have been different.' *Id*." 686 F.3d at 1201.

27

To avoid any difficulty in assessing this matter, we will apply both standards in our analysis.

Dylan does not show either actual bias or a reasonable probability that the result would have been different if Barrett had challenged any juror for cause. On the other hand, the district court carefully considered responses by jurors written on their pretrial questionnaires and their in-court answers to voir dire indicating that they would be impartial. The district court found: "Each juror stated he/she could lay aside his/her impression or opinion and render a verdict based on the evidence presented in court."

For example, D.F. repeatedly said she could be impartial despite family and other connections with Corey. Dylan argues D.F. was statutorily presumed to be biased, but that is not the test. The test is whether D.F. was actually biased or that her presence on the jury was sufficient to undermine confidence in the outcome. Dylan fails to show D.F. was unable to "lay aside [her] opinion and render a verdict based on the evidence presented in court." *Patton v. Yount*, 467 U.S. 1025, 1037 n.12, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984).

After thoroughly examining the record, we have come to the same conclusion regarding the other jurors Dylan identifies. Dylan argues their responses regarding impartiality were equivocal but, assuming that is true, that is different from showing prejudice under either standard. As the trial court noted:

> "[I]t is the trial judge and trial attorneys who not only hear the response of the potential juror but also observe body language which is not reflected by the record, observe how quickly or slowly they respond which is not reflected in the record, and hear the inflection of voice which is not reflected by the record. When a potential juror answers 'I think I can' or 'I believe I can' or 'I will try' or in some similar manner, the trial judge and trial attorneys are in the best position to determine if this is an expression of doubt or a positive response."

The case Dylan cites, *Thompson v. Altheimer & Gray*, 248 F.3d 621 (7th Cir. 2001), is distinguishable. There a juror "said she would *try* to be fair, but she expressed no confidence in being able to succeed in the attempt." 248 F.3d at 626. In the present case, the trial court found—and the prospective jurors' responses considered in their totality supported the finding—that the jurors sufficiently expressed their ability to be impartial. On this record, Dylan does not show prejudice.

Having considered both the performance and prejudice prongs of the *Strickland* test we are persuaded that Dylan has not shown that Barrett was ineffective in his handling of voir dire.

INEFFECTIVE ASSISTANCE REGARDING JUROR MISCONDUCT

Next, Dylan contends that Barrett should have investigated alleged juror misconduct and sought a new trial on that basis. The claimed misconduct was that certain jurors answered falsely during voir dire or failed to disclose a material fact. Although Barrett was aware of some claims by Dylan's family of juror misconduct, he did not file a motion for new trial, based on this ground. Dylan now argues he was denied a fair trial by this failure. The State counters that "no misconduct actually occurred," therefore, Barrett "could not have been deficient in his performance for failing to move for a new trial based on non-existent claims."

The district court ruled based on lack of prejudice. After surveying the evidence Dylan presented at the *Van Cleave* hearing, the district court held that even if Barrett had investigated the allegations and filed a motion for new trial, the court would not have found juror misconduct. In short, the district court considered the evidence and decided the result would not have changed. Given the district court's ruling at the *Van Cleave* hearing, Dylan must now show that, had Barrett filed a motion for new trial, we would

29

have reversed the trial court's denial of it. In this issue, unlike others in the same posture, Dylan has briefed the merits.

Dylan cites *Bell v. State*, 46 Kan. App. 2d 488, 263 P.3d 840 (2011), *rev. denied* 296 Kan. 1129 (2012), for the standard on jury misconduct. Under *Bell*, Dylan must show, "a fundamental failure in the trial based on juror misconduct." 46 Kan. App. 2d at 491. If Dylan makes such a showing, "the State must show beyond a reasonable doubt that the error did not affect the trial's outcome." 46 Kan. App. 2d at 491(citing *State v. Ward*, 292 Kan. 541, 256 P.3d 801 [2011] and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 [1967]). The district court's ultimate decision to deny a motion for new trial is reviewed for abuse of discretion. 46 Kan. App. 2d at 491. "Judicial discretion is abused when (1) the decision is so arbitrary that no reasonable person would agree with it; (2) the decision is based on an underlying error; or (3) the decision is based on an underlying factual error." 46 Kan. App. 2d at 491-92. We consider each of the jurors at issue.

*Juror A.B.*

Dylan alleges misconduct by A.B. regarding her answers during voir dire about her use of Facebook. A.B. made two postings to Facebook after Corey was shot. One mentioned Crystal Cook, Corey's mother and A.B.'s Facebook friend.

> "'Whether you're from Oberlin or not, whether you know the Cook family or not, please take a moment to pray for them, send good thoughts whatever it is you do. They need all they can get right now. Crystal Cook and family, my thoughts and prayers are with you. I pray that justice is served. Please let me know if there is anything I can do.'"

A.B. "tagged" Crystal on this posting. A.B. testified at the *Van Cleave* hearing that tagging "notifies that person that there is something there." A.B. also testified that she had "probably" read postings by Crystal on Facebook regarding the case.

30

A.B. disclosed these matters in her juror questionnaire. She said she was personally acquainted with Crystal, who was a "former co-worker and current friend." When asked if she had "seen, read or heard news reports or rumors of this case," A.B. marked yes and explained: "I have read reports in Oberlin Herald. There has also been a lot of talk of the case from numerous people, both in person & *via internet* (*Facebook*)." (Emphasis added.) When asked, "[d]o you believe you should be excused from serving as a juror," A.B. marked yes and explained: "This is a very small community & I have heard lots about the case from the very beginning."

At voir dire, the prosecutor asked A.B.: "How would you describe your relationship with Crystal?" A.B. said "we enjoyed working together," but that they now saw each other, "no more than in passing." The prosecutor asked: "Has she discussed this case with you?" A.B. answered: "No."

At the *Van Cleave* hearing, Dylan's counsel had an exchange with A.B. regarding her answers on voir dire:

> "Q.      And then on line 24 . . . [the prosecutor] asks, 'Has she discussed this case with you?' And on line 1 . . . you say, 'No,' right?
> "A.      Correct.
> "Q.      And that's true, isn't it?
> "A.      Correct.
> "Q.      As we if we say we're here *discussing* something?
> "A.      Yes.
> "Q.      But you had gotten information from her from Facebook?
> "A.      Yes." (Emphasis added.)

As is clear from this colloquy, during voir dire and at the *Van Cleave* hearing, A.B. understood the verb "discussing" as communicating personally with another individual

and not exchanging Facebook posts. On this record there is no showing of deceit or failure to disclose.

Dylan also complains that A.B. failed to disclose a material fact. When Barrett questioned A.B.'s panel, he asked:  "Is anyone here, anyone here, fans of Facebook?" Barrett said he did "notice a couple of hands go up. If you can indicate which ones so I can follow up on some questions there." Barrett questioned one juror about Facebook. After this, Barrett asked:  "Were there any other individuals that raised their hands as far as their Facebook connections?" Barrett then questioned another juror about Facebook. A.B. was not questioned about Facebook.

Dylan insists the record shows that A.B. failed to raise her hand when asked if she was a fan of Facebook. The State responds that A.B. "was never directly asked during voir dire any questions about Facebook." We agree. With regard to the Facebook questions posed to the panel generally, the State argues that "[i]t is simply impossible to tell from the record" whether she raised her hand or not. Based on Barrett's style of general questioning, and the record before us, it is unknown if A.B. responded to the Facebook questions posed to the panel generally. Moreover, the general questions put to the panel were colloquial and ambiguous—using terms such as "fans of Facebook" and "Facebook connections," which were asked in a way as to not necessarily alert a prospective juror that the question was applicable to them. Even the term, "discussed" was ambiguous as asked during voir dire, as Dylan's counsel candidly acknowledged during his questioning of A.B. at the *Van Cleave* hearing.

In summary, the evidence, showed that A.B. fully divulged on her juror questionnaire that she had a friendship with Crystal and she had learned about the case from Facebook postings. "Potential jurors are not required to be mind readers. Juror misconduct must be based on more than the failure to volunteer information a potential

juror speculates or surmises is important to counsel." *State v. Hopkins*, 257 Kan. 723, 726, 896 P.2d 373 (1995).

In the present case, A.B. disclosed material information that was requested both on her questionnaire and during voir dire which permitted counsel to further inquire into her fitness to serve on the jury. We are not persuaded that the questions and answers at voir dire established that A.B. lied or failed to disclose any material fact about which she was asked.

*Juror B.C.*

B.C. stated during voir dire that he worked at an Oberlin body shop and that Dakota Cook, Corey's brother, had been assigned to the body shop for work-study. Barrett asked B.C. whether Dakota had discussed the case with him. B.C. replied they had not discussed the case at the shop, but that he had given Dakota "crap" about a memory bracelet Dakota wore before learning that "it was in memory of his brother, and I felt like a jerk." B.C. added that Dakota was "always wearing memory shirts and stuff like that."

At the *Van Cleave* hearing, Dylan called Dalton Paul, who had also worked at the body shop. Dalton said Dakota and B.C. were friendly, and Dalton reported overhearing Dakota tell B.C. "about text messages," and also "about Dylan having a gun." Dalton said he heard the two speak about the case five or six times. Dalton denied seeing Dakota wearing a memory shirt at work, saying "[h]e was always in work clothes."

The only direct and material conflict between B.C.'s voir dire answers and Dalton's testimony was whether B.C. and Dakota had discussed the case at work. The State contends the trial court made a credibility determination in B.C.'s favor.

33

The district court found there was "inconsistent testimony between Paul and [B.C.]." It also took judicial notice that shortly after the verdict in this case, Paul "pled guilty to theft and criminal damage to property, with the victim being the body shop where he had formerly worked and where [B.C.] continued to work." The district court concluded, "[t]he credible evidence shows there was no juror misconduct by [B.C.]"

Considering the totality of the evidence, we are persuaded that the district court judged B.C. as more credible than Paul. We do not pass on a determination made by the trial court after viewing the witness. See *State v. Longoria*, 301 Kan. 489, 531, 343 P.3d 1128 (2015). Considering B.C.'s testimony as credible, there is no basis to find any juror misconduct.

*Juror G.M.*

At the *Van Cleave* hearing, Verl Sauvage testified that soon after Corey was shot, perhaps the next morning, he heard G.M. remark: "If I was his dad, I'd have to put him down." Sauvage said he was not sure whom G.M. was referring to. Sauvage said G.M. then asked others: "'Where did this happen at?'" When other individuals identified Ryan's residence, Sauvage concluded that G.M. was referring to the shooting.

On appeal, Dylan interprets the meaning of Sauvage's testimony by identifying individuals in brackets: "'If I was his [Corey Cook's] dad, I'd have to put him [Defendant] down.'" However, given Sauvage's actual testimony, the district court reasonably found:

> "Even if this statement was actually made by [G.M.] it is provided without sufficient context to determine if is related to this case. Even if related to this case, this statement could very well mean that if [G.M.] was [Corey]'s dad he'd have to take his son off of life support. The shooting occurred the early morning of 10/16/2011. [Corey] died 10/17/2011 at the Kearney, Nebraska hospital."

34

We agree with the district court that Sauvage's testimony was ambiguous and that Dylan's interpretation of its meaning was speculative. Accordingly, this testimony did not support a claim of juror misconduct.

Dylan also presented testimony from Shelley Fortin, the owner of a hair salon in Oberlin. Fortin said she heard someone in her salon attribute a comment to G.M. Fortin testified: "I don't remember exactly what they said. Just something to the fact that they hoped that he would get what was coming to him, or that—I don't, I don't really remember what exactly was said." Dylan's counsel asked Fortin if it was "that [G.M.] had said 'I hope he gets what's coming to him'?" Fortin agreed, although she also did not know when the statement was supposedly made.

The district court considered this testimony and concluded: "Again, even if the statement was actually made by [G.M.] it is provided without context. There is also no time frame for when the statement was purportedly made by [G.M.]. It is also unknown who it was that supposedly overheard [G.M.] make this statement." Again, we agree with the district court's analysis. Fortrin's testimony was of little value due to its unknown source, uncertain wording, and the unknown time frame in which it was supposedly made.

Dylan further argues that G.M. committed misconduct by failing to raise his hand during voir dire when Barrett asked the panel, "anyone here attend the funeral services for [Corey]." The transcript indicates two potential jurors, other than G.M., raised their hands. The trial court found that "it is impossible to tell from the record if any others raised their hands." We agree the record does not exclude the possibility that other hands were raised.

Moreover, there is further ambiguity in the record. On appeal, Dylan claims that G.M. attended Corey's funeral, but we could not find testimony substantiating that

35

assertion. Dylan solely relies on the memorial book from Corey's services, but Richard J. Pauls, the funeral director who authenticated the memorial book, testified as follows at the *Van Cleave* hearing:

"Q.      So by being in this book, would that be an indication that these individuals were either at the funeral or the visitation?

"A.      Not necessarily.

"Q.      Well, how not?

"A.      Well, for example . . . if my wife went to a funeral out of town, she would sign Rick, Dorie Pauls and our children's name.

"Q.      Okay.

"A.      There is a possibility they were there.

"Q.      Or likelihood that they were there?

"A.      A possibility."

The entry in the memorial book, without more, does not provide a sufficient evidentiary basis to support the underlying premise that G.M., in fact, attended Corey's funeral services.

*Jurors S.J. and D.F.*

Dylan similarly argues regarding S.J. and D.F., again citing "the signatures contained in the memorial book." Our review of the record did not locate testimony that these jurors, as opposed to their spouses or other family members, attended Corey's funeral services, and Dylan does not cite any testimony. Dylan's inference that both jurors attended the services is further weakened when the ambiguous voir dire regarding funeral attendance is considered.

In summary, Dylan presented extensive evidence at the *Van Cleave* hearing but was unable to prove juror misconduct. We therefore need not consider whether the State could have proved any misconduct was harmless. The trial court would not have abused

36

its discretion in denying a motion for new trial based on the evidence presented at the *Van Cleave* hearing. As a result, Dylan does not show prejudice under *Strickland*. Even if Barrett had filed a motion for new trial, there was not a reasonable probability that the outcome of the proceeding would have been different. Any failure on Barrett's part to seek a new trial based on juror misconduct, therefore, did not deny Dylan a fair trial.

INEFFECTIVE ASSISTANCE REGARDING ABSENCE OF WILLIAMS DURING TRIAL

Dylan contends he was denied effective assistance of counsel by Williams' absence during part of the trial. Barrett always appeared with Dylan throughout the trial. Williams appeared for the first 5 days of trial as well, his mother-in-law died on the evening of the fifth day, and he did not attend the last 3 days of trial. The State counters that Dylan was never without legal representation. It also argues that Dylan has failed to prove prejudice under the second *Strickland* prong.

In ruling on this aspect of Dylan's claim, the district court found:

> "The credible evidence shows Barrett was lead counsel. It was Barrett who was contacted to represent [Dylan], it was Barrett who asked Williams to assist, Barrett was paid the fee not Williams, Barrett was present at every hearing while Williams was not, it was Barrett who filed every motion, and it was Barrett who argued at every hearing while Williams remained virtually silent. The credible evidence also shows [Dylan] was advised of the possibility Williams might be absent for part of the trial and [Dylan] expressed no concern. [Dylan] was not denied his right to counsel by Williams' absence."

Dylan denies Barrett was the lead counsel and repeatedly characterizes Williams as a co-counsel, but Dylan points to no particular failure in his legal representation because of Williams' absence. Instead, Dylan asserts he was denied counsel under *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984): "There are . . .

37

circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658.

*Cronic* applies in limited circumstances:

"Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial. Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." 466 U.S. at 659.

Dylan shows neither a complete denial of counsel nor that Barrett entirely failed to subject the prosecutor's case to meaningful adversarial testing in William's absence. "[O]nly when surrounding circumstances justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into counsel's actual performance at trial." *Cronic*, 466 U.S. at 662. The mere absence of a co-counsel does not support the presumption of ineffectiveness. See *Springer v. Com.*, 998 S.W.2d 439, 456 (Ky. 1999) (where defendant argued she was denied her right to counsel when one co-counsel was absent, the argument was "totally devoid of merit."); *Satterfield v. State*, 256 Ga. 593, 601, 351 S.E.2d 625 (1987) (where a defendant made a similar argument, it had "no merit").

Since *Cronic* is inapplicable, we must consider prejudice under *Strickland*, but Dylan does not argue that he was prejudiced under *Strickland*. Issues not briefed are deemed waived or abandoned. See *State v. Boleyn*, 297 Kan. 610, 633, 303 P.3d 680 (2013). Nevertheless, we can say that, considering Barrett's central role in the litigation, Williams' absence for the last 3 days of trial does not undermine our confidence in the outcome. We find no prejudice.

38

Dylan challenges Barrett's performance "due to his failure to subject the State's aggravating factors to any meaningful adversarial testing." The State responds that "Barrett's decision to argue the aggravating factors to the court at sentencing instead of to the jury was the result of trial strategy and did not fall below an objective standard of reasonableness. The State also contests Dylan's assertion that application of *Cronic* precludes the necessity of showing prejudice.

After the jury returned its guilty verdicts, the jury was advised regarding sentence departure proceedings. The State based its motion for an upward departure on two grounds: "(1) The victim was particularly vulnerable due to his unconscious state of being asleep, which was known by the defendant and (2) The defendant knowingly created a great risk of death to more than one person." Both the State and Dylan declined to present additional evidence and both counsel also waived additional argument. The jury then deliberated and found the two departure factors.

After trial, Barrett filed a motion for a downward durational departure. At sentencing, Barrett made legal arguments regarding why the aggravating circumstances should not be applied, and instead, contended the district court should impose a downward departure sentence.

Barrett began his argument by posing challenges to the departure factors found by the jury. Barrett argued Corey's state of being asleep did not facilitate this commission, citing in support *State v. Neri*, 32 Kan. App. 2d 1131, 1134, 95 P.3d 121, *rev. denied* 278 Kan. 850 (2004), which held: "The essence of the vulnerable victim aggravating sentencing factor is that the vulnerability somehow facilitates commission of the crime." Barrett also argued the risk of death to Sarah, "was not more so prevalent . . . than it

would have been in any other case where . . . a victim was shot and there happened to be a bystander who got hit with a stray BB."

The district court found Barrett's performance was not deficient:

"Here, giving appropriate deference to trial counsel's performance, avoiding hindsight, evaluating the decision from trial counsel's perspective at the time, and indulging the strong presumption that trial counsel's conduct falls within the wide range of reasonable professional assistance, Barrett's decision to argue the aggravating factors to the court at sentencing instead of to the jury was the result of trial strategy and did not fall below an objective standard of reasonableness."

The district court also rejected Dylan's argument for prejudice under *Cronic*. It reasoned:  "Barrett's strategic decision to argue the aggravating factors to the court at sentencing instead of to the jury did not so undermine the proper functioning of the adversarial process that the proceeding cannot be relied on as having produced a just result."

In our judgment, this issue may be expeditiously resolved by considering whether *Cronic* applies and, if not, whether there was a showing of prejudice under the second prong of *Strickland*.

As he has done previously, Dylan argues that *Cronic* applies, but the State cites *Bell v. Cone*, 535 U.S. 685, 692, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002), where defense counsel waived closing argument in the death penalty phase of sentencing after a prosecutor gave "a 'low-key'" closing argument. The United States Supreme Court held that *Cronic* did not apply:

"When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must

40

be complete. We said 'if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing.' [Citation omitted.] Here, respondent's argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points. For purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, this difference is not of degree but of kind." *Bell*, 535 U.S. at 696-97.

If defense counsel's waiver of closing argument in the death penalty phase of sentencing in *Bell* did not engage *Cronic*, neither did Barrett's waiver. In *Bell*, although the prosecutor did present oral argument for the death penalty, defense counsel waived his argument. In the present case, neither the State nor Barrett argued the departure factors. Thus, Barrett's waiver was less significant because there was no State's argument to subject to adversarial testing. We conclude that even if Barrett performed deficiently at this specific point in the proceedings, *Strickland* governs, not *Cronic*. See *State v. Orr*, 262 Kan. 312, 330-31, 940 P.2d 42 (1997) (applying *Strickland* prejudice test when defense counsel made no opening statement and record showed no strategic reason).

As previously noted, Dylan does not argue prejudice under *Strickland*. Issues not briefed are deemed waived or abandoned. See *Boleyn*, 297 Kan. at 633. Regardless, our review of the record shows the evidence amply supported the two departure factors. Barrett's decision to argue against these factors before the district court rather than the jury does not undermine our confidence in the outcome.

INEFFECTIVE ASSISTANCE REGARDING REDACTION OF PRETRIAL INTERVIEW

For his next issue, Dylan argues that Barrett was ineffective for failing to redact his interview with Agent Kendrick. As previously explained, the trial exhibits are not in the record and the recording played for the jury was not transcribed. Dylan and the State now dispute whether a conversation between law enforcement officers, which was

apparently captured by the recording equipment after the interview had concluded, was published to the jury.

The district court advised counsel during the *Van Cleave* hearing that the conversation was not published to the jury. Dylan's counsel objected, saying "the Court cannot testify and make a statement that I can't cross-examine." The trial judge observed that "probably my statement may not have been appropriate," but it still found in its written order: "The video played for the jury was stopped immediately after the interview with [Dylan] ended."

On appeal, Dylan argues that the district court's "'finding' is simply unsworn testimony by the trial court, and it should not be given any weight by this Court." But Dylan has failed to designate a record affirmatively showing the conversation between the law enforcement officers *was* published to the jury in the first instance. Indeed, on this record Dylan is unable to show the conversation even was part of the exhibits admitted in evidence. Moreover, Barrett testified at the *Van Cleave* hearing that the conversation was *not* published to the jury. In short, the record contains evidence supporting the district court's finding apart from its own recollection.

For its part, the State responds that the district court properly could consider its own recollection. Our Supreme Court emphasized in *Van Cleave* that ineffective assistance of counsel claims should be heard by the same judge who conducted the criminal trial precisely because of the judge's first-hand knowledge:

> "The principal problem facing an appellate court when a claim of ineffective assistance of counsel is raised for the first time on appeal is that the trial court, which observed counsel's performance and was aware of the trial strategy involved, is in a much better position to consider counsel's competence than an appellate court is in reviewing the issue for the first time from a cold record. Many times what would appear in the record as an indication of ineffective counsel was fully justified under the circumstances

42

present in the trial court. The trial judge should be the first to make a determination of such an issue and our refusal to consider the matter for the first time on appeal is sound." 239 Kan. at 119.

Appellate courts therefore "give great deference" to the factual findings of a judge regarding ineffective assistance of counsel when that same judge conducted the criminal trial. *Gilkey v. State*, 31 Kan. App. 2d 77, 78, 60 P.3d 351, *rev. denied* 275 Kan. 963 (2003). Judicial recollection is also accepted as a basis for ruling in other contexts. For example, "[i]t is well-established by a number of Kansas cases that a trial court may properly rely upon its own recollection when considering a motion *nunc pro tunc*." *Book v. Everitt Lumber Co., Inc.*, 218 Kan. 121, 128, 542 P.2d 669 (1975).

Based on our review of the record, Dylan does not show the alleged violation occurred. Since, generally speaking, error is never presumed on appeal, *State v. Ralls*, 216 Kan. 692, 693, 533 P.2d 1294 (1975), we conclude Dylan has failed to establish the factual premise of his argument. On the other hand, Barrett's testimony provided proof that Dylan's factual premise was inaccurate.

Dylan identifies two other passages Barrett purportedly failed to redact. Both included statements from Agent Kendrick expressing skepticism regarding Dylan's answers to questions. At the *Van Cleave* hearing, Barrett described his reasoning as follows:

"I saw that as potentially being redacted, but the problem was since Agent Kendrick hadn't been out to the crime scene, he didn't understand how the diagram was set up and how the floor plan was. [Dylan]'s explanation here made good sense when you considered the floor plan, and it made good sense so it would just, it aided the jury to see that Mr. Kendrick was not going into this with an open mind. That's . . . what I thought it did.

43

. . . .

"Another theme that was going along from the defense's perspective was the State didn't do a very good job of investigating, it was tunnel vision, they had their sight set on one particular way and they weren't going to consider others, so they limited their investigation and this played into that."

The district court found Dylan had not shown that "Barrett's strategic decision not to redact parts of the interview was outside the wide range of reasonable professional assistance." In particular, the district court noted, based on Barrett's testimony, that defense counsel wanted to "show law enforcement had tunnel vision during the investigation focused only on [Dylan]."

The State correctly points out that the case cited by Dylan, *State v. Elnicki*, 279 Kan. 47, 105 P.3d 1222 (2005), dealt with more inflammatory statements. A detective interviewing the defendant in that case said such things as: "you just told me a flat out lie," "[a]ll this other bullshit is a waste of your time and my time," "[b]ullshit! You're sitting here bullshitting me," and "[y]ou're weaving a web of [expletive] lies, man." 279 Kan. at 51-52.

Considering the more mild statements here, together with Barrett's trial strategy, Dylan does not show Barrett's decision was outside the wide range of reasonable professional assistance. Indeed, other than placing the word "strategic" in quotes, Dylan does not dispute that Barrett's decision was strategic. And we again cannot fully evaluate Barrett's strategy without the evidence regarding Ryan's residence, such as the diagram Barrett mentioned at the *Van Cleave* hearing.

"It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct.

44

2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984) . Barrett articulated a rational and plausible strategy based on his knowledge of the case facts. See 466 U.S. at 690 ("strategic choices made after thorough investigation . . . are virtually unchallengeable."). We conclude Barrett's strategy stands up to the challenge Dylan makes on appeal.

## INEFFECTIVE ASSISTANCE REGARDING A CLAIMED *BRADY* VIOLATION

For his next issue, Dylan raises a two-fold complaint. First, he contends Barrett was ineffective when he failed to investigate the State's failure to disclose alleged non-prosecution agreements with Everett and Killian. Second, Dylan contends the State's failure to disclose the agreements violated *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), which held a "prosecutor's suppression of evidence favorable to the accused is a violation of a defendant's due process rights under the Fourteenth Amendment to the United States Constitution." *State v. Soto*, 301 Kan. 969, 978, 349 P.3d 1256 (2015). We will focus our analysis on the underlying question of whether there was a sufficient factual basis to show that any non-prosecution agreements existed.

Barrett filed a pretrial "Motion to Reveal Any Deal Made by the State." The State responded that it had "no objection to providing the defense in this case with any information in the possession of the State regarding any 'deal' entered into by the State and any potential witness in the present case." The trial court granted the motion.

The State never informed Barrett of any non-prosecution agreement with Everett and Killian. But after Dylan was convicted, the State announced that Everett and Killian would not be prosecuted. Dylan characterizes the State's announcement as evidence there were, in actuality, non-prosecution agreements.

45

At the *Van Cleave* hearing, however, both Everett and Killian denied the existence of any non-prosecution agreements with the State. They acknowledged being told they would not be charged, but they did not claim that any agreement prevented any future charges or required testimony in return. Everett, for example, said he was "sure" he could still be charged, and Killian said the State had told him he would not be charged, "[a]t that time." Margaret Mahoney, the assistant Decatur county attorney, also testified there were no non-prosecution agreements with Everett and Killian.

The district court concluded: "The credible evidence is that there were no agreements to be disclosed." The district court's finding is supported by substantial evidence. Because Dylan fails to establish the factual premise of his argument, he has failed to show either a *Brady* violation or an ineffective assistance of counsel claim.

INEFFECTIVE ASSISTANCE IN FAILING TO CALL TWO WITNESSES

Dylan argues Barrett was ineffective for failing to call Clint Krizek and a law enforcement officer who took Clint's statement just after the shooting. The officer reported that Clint had overheard Everett say: "'This was not supposed to happen. I didn't mean for this to happen. I didn't know the gun was loaded.'"

Barrett subpoenaed Clint for trial and he appeared at the courthouse. According to Barrett, however, Clint then denied that Everett said he did not know the gun was loaded. Similarly, Clint testified at the *Van Cleave* hearing that he remembered Everett's statement except for any mention of the gun not being loaded. At trial neither Clint nor Agent Keating was called to testify regarding the statements.

On appeal, Dylan argues that Barrett failed to timely investigate Clint's possible testimony in order to have the capability of calling Agent Keating as a witness to testify

46

about his recollection of Clint's statements. According to Dylan, the failure to timely investigate this matter before trial fell below an objective standard of reasonableness.

In ruling that Barrett's conduct was not ineffective performance, the district court found: "Barrett talked to [Clint] prior to calling him as a witness. Barrett discovered [Clint]'s testimony would be different than he expected. Barrett made the strategic decision not to call [Clint] as a witness." On appeal, the State adopts the district court's reasoning and contends that "in light of [Clint's] backpedaling on the statement in the report, [Barrett]'s decision not to call him was entirely reasonable."

Clint's recollections of Everett's statements could be understood in different ways, but we are persuaded the statements were not clearly exculpatory with regard to Dylan nor clearly inculpatory with regard to Everett. Especially when Barrett learned at the courthouse that Clint's present recollection was at variance with Agent Keating's report, the decision not to call him as a witness was defensible as a matter of strategy. Assuming Agent Keating was called as a witness and impeached Clint, the net value of the testimony would have been significantly less than if Clint had testified in accord with Agent Keating's report.

While other defense counsel may have chosen a different path in handling Clint's anticipated testimony, we are mindful that *Strickland* imposes a "highly demanding" burden on a defendant to prove "gross incompetence." *Kimmelman v. Morrison*, 477 U.S. 365, 382, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986). Assuming Barrett's handling of this potential testimony was mistaken, for his performance to be constitutionally ineffective "it must have been completely unreasonable, not merely wrong." *Boyd v. Ward*, 179 F.3d 904, 914 (10th Cir. 1999). All things considered, we conclude that Barrett's performance was not constitutionally infirm.

47

Still, although the district court did not address prejudice, we will consider *Strickland*'s prejudice prong. Dylan argues only that the "prejudicial impact of counsel's error in this regard must be considered cumulatively with the other errors of counsel." We will consider cumulative prejudice later, but Dylan does not show any prejudice with regard to Barrett's handling of Clint's anticipated testimony. While Clint's statements may have added something to the defense, as noted earlier, they were ambiguous and not obviously exculpatory. Dylan has not made the requisite showing of prejudice.

## INEFFECTIVE ASSISTANCE REGARDING A CONFLICT BETWEEN THE PROSECUTOR AND KILLIAN

For his final claim of ineffective assistance, Dylan contends Barrett was ineffective for not investigating a verbal dispute between Assistant Attorney General Nicole Romine and Killian.

When Barrett cross-examined Killian at trial, Killian acknowledged speaking to a defense investigator. Killian, however, had apparently told prosecutors before trial that he did not speak with a defense investigator. After Killian's trial testimony, Romine followed him outside the courthouse and a verbal confrontation took place. Killian made an angry and vulgar Facebook posting about the confrontation afterwards. Apparently Romine had accused him of being "less than honest" with regard to telling the prosecutors that he had not spoken to the defense.

Patti Coryell, Dylan's mother, testified at the *Van Cleave* hearing that she had witnessed the dispute between Romine and Killian. Patti said Romine was "pointing her finger in his face," and that Killian "was actually kind of leaning backward, kind of standing back with his arms crossed, and it looked to me like he was being berated." Patti could not hear what was being said, however, and she did not know whether nearby jurors also saw the confrontation. Patti returned to the courtroom and informed Barrett

about the confrontation. She could not recall whether she had informed Barrett of the jurors who were in the vicinity. Later, she did tell Barrett about Killian's Facebook posting.

At the *Van Cleave* hearing the district court ruled that "even if [Killian] was not honest with prosecutors by failing to tell them he had talked to the defense investigator, there is no reasonable probability the result of the proceedings would have been different even if trial counsel had investigated the matter."

On appeal, Dylan now asserts Barrett had a duty to investigate, but he does not indicate precisely what Barrett would have found if he had investigated, nor what other steps Barrett should have taken. Dylan makes reference to *Brady* on the basis that "the prosecutor believed [Killian] had lied on the stand," but there is no suggestion in the record that Killian lied on the stand. On the contrary, the prosecutors were upset that Killian had lied to them prior to trial. The State argues in response that this issue has "no factual support," and Dylan offers no reply.

We find no error with regard to either prong of the *Strickland* standard.

CUMULATIVE CLAIMS OF INEFFECTIVE ASSISTANCE

Dylan argues that "even if some of the claims, standing alone, would not establish the requisite prejudice under the *Strickland* standard, the cumulative effect of counsel's errors deprived [him] of a fair trial." Our Supreme Court has stated in a case with several ineffectiveness claims: "While each individual error may not have required reversal, the accumulation of these errors undermines our confidence in the trial's outcome." *In re Care & Treatment of Ontiberos*, 295 Kan. 10, 41, 287 P.3d 855 (2012). Following *Ontiberos*, this court has stated: "A defendant can establish prejudice by demonstrating that an accumulation of errors created a reasonable probability of changing the outcome

of the trial." *Wilson v. State*, 51 Kan. App. 2d 1, 15, 340 P.3d 1213 (2014), *rev. denied* 301 Kan. ___ (April 29, 2015).

At the *Van Cleave* hearing, the district court rejected Dylan's cumulative error argument:

> "This Court presided at all stages of the case after the preliminary hearing. This Court heard all of the motions; heard all of the testimony; reviewed all of the exhibits; observed the defendant, families and spectators; observed prospective jurors and those who actually served on the jury; observed the witnesses; was aware of the trial strategy; observed trial counsel's level of preparedness; and observed trial counsel's level of professionalism. . . .
> "The Court . . . finds, having considered the totality of the circumstance[s], that any error or combination of errors that may have been made did not substantially prejudice the defendant and did not deny him of a fair trial. The adversarial process functioned properly and produced a just result."

Notably, the district court said it had "reviewed all of the exhibits," something we are unable to do because Dylan did not include them in the record on appeal.

But having considered the record before us, we have not found multiple errors in Barrett's performance in this litigation. To the extent that Barrett's performance involved any errors—considered cumulatively—his legal representation does not "undermine[] . . . confidence in the trial's outcome," *In re Care & Treatment of Ontiberos*, 295 Kan. at 41, or "create[] a reasonable probability of changing the outcome of the trial." W*ilson*, 51 Kan. App. 2d at 15. Dylan does not show cumulative error.

## SENTENCING

For his final issue on appeal, Dylan contends the district court erred by departing upward from the sentencing range for intentional second-degree murder. Dylan

challenges the jury's findings on both departure factors. He also claims double-counting because his intentional second-degree murder conviction was enhanced based on a fact which established an element of the aggravated battery conviction, *i.e.*, the shotgun pellet which struck Sarah. Lastly, Dylan argues the district court abused its discretion by considering that his actions resulted in death.

We review matters involving departure sentencing under a multi-faceted standard of review:

> "(1) When the question is whether the record supported a sentencing judge's particular articulated reasons for departure, an appellate court's standard of review is substantial competent evidence; (2) when the question is whether a sentencing judge correctly concluded that particular mitigating factors constituted substantial and compelling reasons to depart in a particular case, including whether those mitigating factors outweighed any aggravating factors if such a balance is necessary, the appellate standard of review is abuse of discretion; (3) when the question is whether a particular mitigating or aggravating factor can *ever*, as a matter of law, be substantial and compelling in *any* case, the appellate standard of review is de novo; and (4) when the challenge focuses on the extent of a durational departure, the appellate standard of review is abuse of discretion, measuring whether the departure is consistent with the purposes of the guidelines and proportionate to the crime severity and the defendant's criminal history."
> *State v. Spencer*, 291 Kan. 796, Syl. ¶ 1, 248 P.3d 256 (2011).

When the issue requires statutory interpretation, appellate review is unlimited. See *State v. Eddy*, 299 Kan. 29, 32, 321 P.3d 12, *cert. denied* 135 S. Ct. 91 (2014).

Dylan had a criminal history score of I, and the presentence investigation report showed a sentencing range for intentional second-degree murder of 147 months to 165 months. After the jury found the two sentencing factors, the district court departed upward to 212 months. The district court then imposed an upper range sentence of 13 months for the aggravated battery conviction and ran both sentences concurrently.

For his first claim of sentencing error, Dylan reprises Barrett's argument at sentencing based on the *Neri* case—that Corey's state of being asleep did not "'facilitate'" the crime. At the outset, this statutory aggravating factor does not mention facilitation: "The victim was particularly vulnerable due to age, infirmity, or reduced physical or mental capacity which was known or should have been known to the offender." K.S.A. 2014 Supp. 21-6815(c)(2)(A). The panel in *State v. Neri*, 32 Kan. App. 2d 1131, 1134, 95 P.3d 121, *rev. denied* 278 Kan. 850 (2004), discussed facilitation only because the victim in that case was an organization lacking the human qualities mentioned in the statute. 32 Kan. App. 2d at 1134.

The present case, however, features a human being as a victim, not an organization. The jury found, "the victim, Corey Cook, was particularly vulnerable due to his unconscious state of being asleep, which was known to the defendant." The jury's finding was well supported by the evidence. Corey was particularly vulnerable during the time immediately preceding and at the time Dylan shot him with the shotgun. During this time period, Dylan surveyed the bedroom, argued about whether to wake Corey and finally shot him. Simultaneously, Corey was obviously and totally unaware of the impending peril—unable to speak, move, or defend himself in any way. It is difficult to conjure up a factual scenario in which a victim could be considered more vulnerable than Corey was at the time of the shooting.

With regard to the jury's other departure finding, that Dylan "knowingly created a great risk of death to more than one person," this finding was also amply supported by the evidence. It is an understatement to observe that shooting a shotgun inside a bedroom in the general direction of two people lying next to each other on a bed presents a circumstance which creates a great risk of death to more than one person. The fact that Sarah was struck during the shooting which killed Corey further exemplifies the obvious danger presented by this situation.

We conclude the district court did not err in finding the two statutory aggravating factors provided a sufficient factual and legal basis to order an upward departure sentence in this matter.

Next, in one sentence in his appellate brief, Dylan complains, without citation to authority, that because he was convicted of the aggravated battery of Sarah, using "this same conduct to enhance [his] sentence amounts to impermissible double counting." Dylan makes the point merely in passing, and issues not supported with authority or sufficient argument are waived or abandoned on appeal. See *State v. Llamas*, 298 Kan. 246, 264, 311 P.3d 399 (2013). This point has been waived or abandoned.

For his final sentencing argument, Dylan states, "the district court abused its discretion in determining the extent of the upward departure in this case based on the fact that this offense resulted in death." Dylan contends death "had already been taken into account by the [l]egislature when it set the crime severity level."

This is a legal argument, but discretion is abused when it is guided by an erroneous legal conclusion or goes outside the framework of or fails to consider proper statutory limitations or legal standards. See *State v. Ardry*, 295 Kan. 733, 736, 286 P.3d 207 (2012). The proper legal standard is whether the extent of the departure was "consistent with the purposes of the guidelines and proportionate to the crime severity and the defendant's criminal history." *Spencer*, 291 Kan. 796, Syl. ¶ 1.

In considering the extent of the upward durational departure, the district court began with the aggravated grid sentence, 165 months, and stated that this amounted to 13.75 years. The State asked the district court to depart to 20 years, but the district court declined. It reasoned that 20 years would have been the sentence for felony murder, a charge the State could not prove. The district judge observed: "Here [Dylan] was found guilty of a lesser crime, so it seems to me he should have a lesser punishment."

53

Thus, the district court set the parameters for the exercise of its discretion; given the decision to depart upward, the departure sentence would fall somewhere between 13.75 years and 20 years. The district court settled on 212 months, but only after taking into consideration Dylan's access to 15% good time credit. The district judge stated: "By my calculations, if you do earn the 15 percent good time credit, then you would be eligible for release in approximately 180 months, which would be 15 years."

The district court did mention the fact that other severity level 1 crimes do not involve death, but that discussion was quickly followed by a discussion of more serious crimes such as premeditated and felony murder. The State, therefore, is correct that the district court was laying "out the spectrum of crimes and punishments." Moreover, since intentional second-degree murder causes death, it may be considered a more serious offense than some other severity level one crimes. The district court could, therefore, properly consider Corey's death when deciding the duration of the departure. See *State v. Bird*, 298 Kan. 393, 399, 312 P.3d 1265 (2013) (underlying principles of the Kansas Sentencing Guidelines Act include that "sanctions should be imposed based on harm inflicted").

Dylan does not show that the district court erred when departing upward at sentencing. We conclude the district court's sentencing decision was consistent with the legal standard of departing to the extent consistent with the purposes of the guidelines and proportionate to the crime severity and the defendant's criminal history.

Affirmed.